**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CLIFFORD GEORGE,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>THOMAS W. EDHOLM, individually in his capacity as an M.D.; GREG FREEMAN, individually in his capacity as a PD Officer; Daryll Johnson, individually in his capacity as a PD Officer,<br>*Defendants-Appellees*. | No. 11-57075<br><br>D.C. No.<br>2:06-cv-00200-<br>GW-AJW<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted
June 4, 2013—Pasadena, California

Filed May 28, 2014

Before: Kim McLane Wardlaw and William A. Fletcher,
Circuit Judges, and Barbara M. G. Lynn, District Judge.*

Opinion by Judge W. Fletcher

---

* The Honorable Barbara M. G. Lynn, District Judge for the U.S. District Court for the Northern District of Texas, sitting by designation.

## SUMMARY[**]

### Prisoner Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment and remanded an action brought pursuant to 42 U.S.C. § 1983 alleging that police officers, a doctor, and two nurses violated plaintiff's rights under the Fourth and Fourteenth Amendments when the doctor, forcibly and without consent, removed a plastic baggie containing cocaine base from plaintiff's rectum.

Reversing the district court's summary judgment in favor of the police officers on the Fourth Amendment claim, the panel first held that the doctor's conduct could be attributed to the police officers because a reasonable jury could conclude that the officers gave false information about plaintiff's medical condition to the hospital staff and to the doctor with the intent of inducing the doctor to perform an invasive search. The panel then held that based on the factors set forth in *Winston v. Lee*, 470 U.S. 753, 759–60 (1985), a jury could conclude the procedures performed by the doctor violated the Fourth Amendment. The panel further held that the police officers were not entitled to qualified immunity on the Fourth Amendment claim.

The panel affirmed the district court's summary judgment in favor of defendants on plaintiff's separate Fourteenth Amendment claim which was based on his right to refuse unwanted medical treatment. The panel determined that it

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

could not say that "every reasonable official" would have known the procedures performed by the doctor violated the Fourteenth Amendment and therefore defendants were entitled to qualified immunity. Finally, the panel declined to address issues related to the liability of the doctor who performed the procedure, stating that the district court could do so on remand.

## COUNSEL

Michael B. Kimberly (argued) and Charles Alan Rothfeld, Mayer Brown LLP, Washington, D.C., for Plaintiff-Appellant.

Thomas W. Edholm, pro se, Redding, California.

Roger A. Colvin and Sharon Apodaca (argued), Alvarez-Glasman & Colvin, City of Industry, California, for Defendants-Appellees.

# OPINION

W. FLETCHER, Circuit Judge:

Clifford George appeals a grant of summary judgment to Pomona Police Officers Greg Freeman and Daryll Johnson. Acting pro se, George sued Freeman, Johnson, and a medical doctor and two nurses under 42 U.S.C. § 1983, alleging that they violated his rights under the Fourth and Fourteenth Amendments when the doctor, forcibly and without consent, removed a plastic baggie containing cocaine base from George's rectum. We reverse in part, affirm in part, and remand for further proceedings.

## I. Background

### A. Factual Summary

According to a police report written by Officer Freeman, on March 13, 2004, George and another man were standing in the front courtyard of an apartment complex in Pomona, California. Freeman and his partner were patrolling the area, which they knew to be a hangout for gang members and drug dealers. They spotted the two men, got out of their police cruiser, and approached them. George started to run "towards the front gate, as if he was going to flee." Freeman ordered George to stop, and George complied. George told Freeman he was on parole for an armed robbery conviction.

Officer Freeman and two other officers conducted a parole search of George's apartment. Inside, they encountered George's brother, Jeremiah English. Freeman found a .380-caliber semi-automatic pistol in a hallway closet. Freeman arrested George for violating his parole by

living in an apartment with a firearm, English for being a gang member with a firearm, and George's companion for loitering. Freeman and his partner took all three men to the Pomona city jail.

Freeman and Johnson took George to the "strip tank" for a strip search. Freeman wrote in his report that George removed his clothes, but "whe[n] we asked him to turn around, he immediately started shaking and went to the ground as if he was possibly having a seizure. . . . [W]hen he was on the ground with his right hand he reached under his body and started pushing his finger in his anus attempting to conceal an item, of what appeared to be some plastic baggie. Due to my training and experience in the field of narcotics, myself and Corporal Johnson believed it was a bag of cocaine."

Officer Freeman testified in his deposition that he did not believe that George was having a seizure, "[b]ecause he was concealing the narcotics or cocaine that we recovered out of his rear end." Freeman estimated that he had encountered "similar scenarios . . . where someone undergoing a strip search either faked a seizure or attempted to conceal things in their rectum during the strip search . . . five times — four to five times." Officer Johnson testified similarly in his deposition. He testified that in his experience it is "very common for people to carry [crack cocaine or other contraband] between their butt cheeks." He did not believe George was having a seizure. Rather, he believed that George "was faking having a seizure to cover . . . up" his attempt to conceal a plastic baggie of cocaine base in his anal cavity. He testified, "[I]t was obvious to me that that whole fake medical situation was a distraction so he could shove a baggie in his anus."

An unspecified person at the jail called for paramedics. George testified in his deposition that "Freeman kept hollering [to the paramedics], yelling that I swallowed something and he stuck something up his anal and we need to get it out." Officer Freeman testified, "I think I told [the paramedics] that he — that he possibly had a seizure and that we needed to get him medically cleared for booking." He testified further that the paramedics took George to the hospital "to save his life." Officer Johnson testified differently. When asked if "there was anything medically wrong" with George when he took him to the hospital, Johnson answered, "I did not think so." He testified that he and another officer took George to the hospital in a police vehicle. Hospital records state that police officers took George to the hospital, and that George was in police custody when he arrived. Johnson testified that Freeman came to the hospital sometime later. However, George testified that "Freeman and Johnson took me to the hospital."

Freeman was asked about other instances in which a person was taken to the hospital because of cocaine base concealed in the rectum. He responded:

> Specifically, I remember a doctor had one on a Porta-Potty. Another one, I believe the doctor had to give him a sedative or something to relax the body. . . . I think the doctor used forceps to pull it out of his rectum.

In the instance where forceps were used, Freeman did not say whether the person had consented to the procedure. Freeman did not describe any case in which the person had been intubated or had his bowels evacuated.

Johnson testified that on "six or eight" previous occasions he transported to the hospital people who had inserted into their rectums baggies containing cocaine. He testified:

> I know, in some instances, they were given some type of a pill or a drink, maybe a laxative of some type. On another occasion, there was a laxative like a suppository. Another time I waited in the intensive care unit with somebody that had cocaine in their rectum, and it was all up to the doctor.

Johnson testified that in all but one of the instances, the baggie was intact when it emerged. Johnson described the one instance in which the baggie had not been intact. In that instance, the person had been taken to intensive care because of a high heart rate. At one point, Johnson and another officer had actually seen, "barely protruding," the "clear plastic and the actual white cocaine," but by the time they got to the hospital it was no longer visible:

> The doctor used a type of scope. I believe the person's heart rate was very high and the doctor couldn't find it, and we told him that we had actually seen it, the both of us. And so I believe the doctor was — had him taken up to ICU because of his heart rate, and he was monitored. He was given suppository or, you know, some type of laxative, and eventually the laxative worked and the baggie of cocaine was recovered.

The recovered baggie was not intact when Johnson saw it, but he testified, "I don't know if it came out not intact or if it was

ripped by the suspect." When asked if any of the six or eight people had the cocaine "removed surgically," Johnson answered, "No, I have never seen that." But he had seen "some type of device," which he described as "not really forceps," used to pull out a baggie or baggies.

Acting pro se, George sent Requests for Admission to Officers Freeman and Johnson. They provided identical answers to a Request concerning the paramedics' evaluation. They both wrote, "The Los Angeles County Fire Department Paramedics informed me that plaintiff was not having a seizure." In his deposition, Freeman backtracked from this answer. In response to the question, "Did the paramedics convey to you any information about Mr. George's medical condition?" Freeman testified, "I don't remember anything specifically."

Officers Freeman and Johnson both answered "Admit" to the following Request: "Admit that, when you arrived at said medical hospital, you informed *Dr. Edholm*, (the treating [doctor],) that plaintiff appear[ed] to have swollen some drugs and/or that there may be some in his rectum." In their depositions, they both backtracked. During Freeman's deposition, the following exchange occurred:

> Q: You didn't say — you didn't tell anyone anything about him swallowing drugs through his mouth?
>
> . . .
>
> A: I don't remember telling anybody about anything. . . .

. . .

Q: As you sit here today, do you recall telling Dr. Edholm that the patient may have — or that Mr. George may have swallowed some drugs or "swollen," any sort of variation of that word?

A: No.

Johnson testified, "I don't recall ever saying something like 'swollen' or 'swallowed drugs.' I don't recall that in this incident."

Hospital records indicate that the "police department" told intake personnel that George had swallowed cocaine, had put cocaine into his rectum, and had possibly had a seizure. The hospital's Emergency Department Triage Record, filled out when George arrived at the hospital, stated, "Per P.D: pt. ingested cocaine & put some into his rectum. Possibly had a seizure."

Officer Johnson testified that George was taken to a room at the hospital, placed on a gurney, and restrained with straps. He testified that nurses initially evaluated George, and that Dr. Thomas Edholm, an emergency-room physician, arrived a short time later. George wrote in his verified complaint:

The defendant Edholm was then informed by the defendant's [sic] Johnson & Freeman, that there exist a medical emergency . . . that plaintiff may have swallowed drugs. "We need it out now."

An intake form lists George's blood pressure as 180/108, his pulse as 108, his respiratory rate as 18, his temperature as 98, and his condition as "stable." The hospital's triage record, prepared at roughly the same time, lists his breathing as normal and describes him as "[a]lert and oriented x 4" (the highest level). The hospital discharge report, signed by Dr. Edholm at George's release, shows George as having had blood pressure of 180/115, a pulse of 120, respiratory rate of 18, and a temperature of 98. In his deposition, Edholm described these numbers as "severely high" and "consistent with cocaine toxicity."

George testified that Dr. Edholm initially tried to remove the plastic baggie by inserting his fingers in George's rectum. George recounted:

> The doctor came in and say, hey, what's the problem.
>
> Freeman kept stipulating we think that he took something and we think he shoved something up his a-s-s and the doctor put — they put me on the table. . . . I was laying there naked and the doctor said lift him up . . . so the officers came and they held me down and then the next thing you know I see the doctor he put on . . . this glove and put some type of gel or whatever . . . and . . . he stuck his fingers his hands up my butt.
>
> . . .
>
> He went up in me and it hurt. . . . I yelled I said why are you doing this? You can't do

this. You're battering me. You can't do this
I kept telling him and Freeman kept opening
his mouth, too, telling the doctor like, you
know, Goddamn it, I know that he's got it, so
hold him down so they held me down and
then the next thing you know this doctor said,
hey, this is not going to work.

. . .

[The officers] were holding my legs down.

. . .

The police officers . . . flipped me over.
They said roll him over, because that nurse
she was too busy holding that IV in my
arm . . ., and I kept telling them what are you
doing this for, and as soon as he stuck his
thing up my ass and I was screaming I was
hollering because it hurted. . . . I mean he had
his hands right up my rectum and never had
that before, ma'am, you understand, and that
violated me and I was, you know, I just never
had anybody go up in me like that, ma'am.

George was asked at the deposition if he remembered
either of the officers telling Dr. Edholm what to do. He
responded, "All I know is I hear Freeman tell him that you
need to get this out of his ass. He's got something up his ass,
Goddamn it, I know he does." He reiterated later that
Freeman said, "I know he's got something up his ass. You
need to get that out. I know he does." Freeman denied
having said that:

Q: At any point, did you tell Dr. Edholm that you needed the cocaine out now?

A: No. He would have laughed at me.

Freeman testified that he did not remember holding George down: "If I would have, I would have remembered." Johnson testified that he did not recall holding George down or turning him onto his side.

George testified that Dr. Edholm told him that he would be sedated: "[H]e explained to me . . . we're going to paralyze you." George testified:

I was . . . looking at this doctor what he's going to do, because I didn't know what he was going to do and kept getting all these big clamps, I seen these big clamps and I kept asking, you know, I remember one of the officers asking . . . . He says, well, we're going to open up his rectum with this. That's when I just got hysterical.

George testified that, when he regained awareness, he

woke up on my back with a big tube down my mouth and stuff kept coming out of me out of my anal. They had a big plastic bag I remember on the bed and whatever that was inside of me was flushing stuff through my stomach coming out of my anal and I remember a lot of stuff, water coming out of my buttock, my anal.

. . .

> And then I'm still there whatever they're doing flushing me out I'm just laying there and just I was so mad . . . because what they had done to me and all I just seen was just blood on that bed and everything and my anal hurting so bad because I was bleeding a lot.

He testified that he was still bleeding when he was discharged from the hospital, wearing his jail jumpsuit: "I was hurting bad, ma'am. And even through that jumpsuit I was still bleeding I was bleeding so bad."

Dr. Edholm testified in his deposition that he had no specific recollection of treating George. He testified solely based on notes he had dictated after treating George, which were contained in George's discharge report. Edholm recounted that he was able to feel "a plastic type of material" in George's rectum, but George's resistance prevented him from removing it by hand. Edholm then engaged in what he called "aggressive management."

Dr. Edholm testified that a nurse sedated George. Edholm then inserted a metal anoscope into George's rectum. He stated that through the anoscope, he and one of the police officers viewed a golf ball-sized baggie filled with white material. Edholm removed the baggie with long forceps and gave it to the officer. The plastic baggie was intact.

Dr. Edholm then intubated George and inserted a tube through his nose into his stomach. Through the tube, George was given one gallon of a liquid laxative called GoLYTELY,

which, according to Edholm, "flushes and washes everything out of your intestines completely."

Dr. Edholm testified that his treatment of George "was based on the information from the police and the nurses and his physical evidence of cocaine toxicity." This information led him to conclude that George's life was in danger. He explained, "If a patient has evidence of a life-threatening condition, we have to . . . aggressively treat it." Edholm stated the basis for his conclusion was "[t]he elevated blood pressure, pulse, history of having a seizure. If you have a seizure from cocaine, it's usually associated with severe toxicity." Edholm believed that George had ingested cocaine based on the medical history taken by a nurse and recorded on the triage record. In his deposition, he read aloud the nurse's note on the record, saying, "[p]er PD, patient ingested cocaine."

It is undisputed that George did not consent to any of the medical procedures. Dr. Edholm acknowledged in his deposition that the procedures required patient consent and said he acted "without [George's] compliance." Edholm testified that, as an emergency doctor, he does not routinely seek patient consent: "It's an emergency, so I don't routinely ask patients for consent." In his view, the "admissions staff [was] responsible for obtaining patient consent."

Later testing showed that the intact plastic baggie removed from George's rectum contained about 8.99 grams of cocaine base. George was charged with possession of cocaine base for sale in violation of California Health & Safety Code § 11351.5. He pled no contest to the offense. He is currently serving an eight-year prison term. Defendants

in this case have made no argument based on *Heck v. Humphrey*, 512 U.S. 477 (1994).

## B. Procedural History

George brought suit under 42 U.S.C. § 1983 against Officers Freeman and Johnson, Dr. Edholm, and two nurses. He alleged violations of the Fourth and Fourteenth Amendments based on his initial detention, the search of his apartment, and his treatment at the hospital. *See George v. Edholm*, 410 F. App'x 32, 33–34 (9th Cir. 2010). Neither Edholm nor the nurses answered the complaint.

The district court granted summary judgment in favor of Officers Freeman and Johnson. It dismissed with prejudice George's claims against Dr. Edholm and the nurses because they had not been served. *Id.* On appeal, we affirmed summary judgment as to George's claim arising out of his initial detention. *Id.* at 34. We also affirmed summary judgment in favor of the nurses. *Id.* We reversed and remanded as to the remainder of George's claims. *Id.* at 33–34. We held that George should have been allowed to withdraw his deemed admissions during discovery, held that his sworn complaint should serve as an affidavit, and instructed the district court to allow George to perfect service on Dr. Edholm. *Id.* at 33–34 & n.1.

On remand, George, now represented by pro bono counsel, served the complaint on Dr. Edholm. Edholm still has not answered. After limited discovery, Officers Freeman and Johnson again moved for summary judgment. The district court granted the motion. The court believed that its ruling, if correct, would resolve George's claims against Edholm. To take care of the "technicality" of Edholm's

failure to appear, the court suggested that George voluntarily dismiss Edholm without prejudice. Before George filed a voluntary dismissal, the court entered a final judgment dismissing George's complaint in its entirety. The following day, George filed a voluntary dismissal as to Edholm.

George timely appealed. He appeals only the grant of summary judgment on his claims arising out of his treatment at the hospital.

## II. Standard of Review

We review de novo the district court's grant of summary judgment. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). We must determine, "viewing the evidence in the light most favorable to the nonmoving party, whether genuine issues of material fact exist." *Id.* We will affirm only if no "reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that the plaintiff is entitled to a favorable verdict." *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010). "If a rational trier of fact could resolve a genuine issue of material fact in the nonmoving party's favor," summary judgment is inappropriate. *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011). "[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from facts are jury functions, not those of a judge." *Id.* (quoting *Nelson v. City of Davis*, 571 F.3d 924, 927 (9th Cir. 2009)).

We also review de novo the district court's ruling on qualified immunity. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013). At the summary judgment stage, we ask whether the facts, "[t]aken in the light most favorable to

the party asserting the injury," show that the officers violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). If the officers violated a constitutional right, we determine de novo "whether federal rights asserted by a plaintiff were clearly established at the time of the alleged violation." *Martinez v. Stanford*, 323 F.3d 1178, 1183 (9th Cir. 2003).

## III. Discussion

George claims that the conduct of Officers Freeman and Johnson, and the treatment administered by Dr. Edholm at the hospital, violated his Fourth Amendment right to be free from unreasonable searches, as well as his Fourteenth Amendment right to refuse medical treatment. The district court granted summary judgment to Freeman and Johnson on the ground that Edholm acted as a private citizen whose conduct could not be imputed to Freeman and Johnson. The district court further held that even if Freeman and Johnson violated George's constitutional rights, they were entitled to qualified immunity.

## A. State Action

The district court held as a matter of law that Dr. Edholm's conduct could not be attributed to the state. We disagree.

George does not dispute that Dr. Edholm is a private citizen whose conduct ordinarily would not be attributable to the state. *See Brunette v. Humane Soc'y of Ventura Cnty.*, 294 F.3d 1205, 1209 (9th Cir. 2002). Private action may be attributed to the state, however, if "there is such a 'close

nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). Such a nexus may exist when, for instance, private action "results from the State's exercise of 'coercive power,'" or "when the State provides 'significant encouragement, either overt or covert,'" to the private actor. *Id.* at 296 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).

Police officers may not avoid the requirements of the Fourth Amendment by inducing, coercing, promoting, or encouraging private parties to perform searches they would not otherwise perform. *See United States v. Reed*, 15 F.3d 928, 932–33 (9th Cir. 1994); *see also Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999) (allowing a finding of state action where a jury could find that actions were "unlikely to have been undertaken" without state encouragement (internal quotation marks omitted)). The Supreme Court has stated, "[I]t is . . . axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (internal quotation marks omitted). A private party's search may be attributed to the state when "the private party acted as an instrument or agent of the Government" in conducting the search. *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614 (1989); *Reed*, 15 F.3d at 931; *United States v. Walther*, 652 F.2d 788, 791 (9th Cir. 1981). Police officers may be liable for a private party's search when the police "ordered or were complicit in the search[]." *United States v. Sparks*, 265 F.3d 825, 831 (9th Cir. 2001), *overruled on other grounds by United States v. Grisel*, 488 F.3d 844 (9th Cir.

2007) (en banc); *see also United States v. Ziegler*, 474 F.3d 1184, 1188, 1190 (9th Cir. 2007) (finding state action where an FBI agent told a private employer to make a copy of its employee's computer files); *Dyas v. Superior Court*, 522 P.2d 674, 677 n.2 (Cal. 1974).

A reasonable jury could conclude that Officers Freeman and Johnson gave false information about George's medical condition to the hospital staff and to Dr. Edholm, with the intent of inducing Edholm to perform an invasive search. There is evidence in the record showing that Freeman and Johnson knew that George did not have a seizure. They both admitted in response to written requests from George that the paramedics told them that George had not had a seizure, and they both testified in their depositions that they believed George was faking a seizure. There is evidence in the record showing that neither Freeman nor Johnson believed that George had swallowed any cocaine. They both denied telling anyone that he had done so. But the hospital triage record indicates that hospital staff had been told by police ("per P.D.") that, in addition to inserting cocaine into his rectum, George had also ingested cocaine and had possibly had a seizure. George specifically stated that he heard Freeman tell Edholm that George had swallowed cocaine. There is evidence in the record that the information that George had ingested cocaine and had possibly had a seizure led Edholm to perform a more invasive search than he otherwise would have. Edholm testified that his decision to treat George aggressively was based in part on that information. Finally, there is evidence in the record that Freeman and Johnson physically assisted Edholm by turning George on the table and holding his legs, and that Freeman emphasized to Edholm the necessity for prompt action in removing the cocaine from George's rectum.

There is, of course, contrary evidence. Freeman backtracked from his response to George's Request for Admission, claiming in his deposition that he did not recall the paramedics saying that George did not have a seizure. Freeman and Johnson both backtracked from their admissions that "plaintiff appear[ed] to have swollen [sic] some drugs." Freeman stated in his deposition, "I don't remember telling anybody about anything." Johnson stated, "I don't recall ever saying something like 'swollen' or 'swallowed drugs.'" These statements, if believed, would tend to show that neither Freeman nor Johnson was the source of the false information in the hospital's triage record. Further, Freeman denied telling Edholm to take the cocaine out of George's rectum, and Freeman and Johnson both stated that they could not remember turning and holding George down in the hospital.

However, a reasonable jury would not be required to believe any of the contrary evidence just described. Instead, it could believe the evidence favorable to George. Based on this evidence, a reasonable jury could find that Freeman and Johnson provided "significant encouragement, either overt or covert," to Dr. Edholm, *Brentwood Acad.*, 531 U.S. at 295, and that they "induce[d], encourage[d] or promote[d]" Edholm to do what he would not otherwise have done, *Norwood*, 413 U.S. at 465; *see Reed*, 15 F.3d at 932–33, such that Edholm's actions are attributable to the state.

To hold Dr. Edholm personally liable as a state actor, George must establish not only that Edholm was induced to act as he did, but also that Edholm intended to assist Freeman and Johnson in obtaining evidence for their investigation. *See United States v. Attson*, 900 F.2d 1427, 1433 (9th Cir. 1990) (holding that "a party is subject to the [F]ourth [A]mendment only when he or she has formed the necessary intent to assist

in the government's investigative or administrative functions"). We hold only that Edholm's actions could be attributed to the state, based on our holding that a reasonable jury could conclude that Freeman and Johnson provided false information, encouragement, and active physical assistance to Edholm. We do not reach the different question whether a jury could conclude that Edholm is himself liable under § 1983. *See Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 196 n.13 (3d Cir. 2005) (noting that even if a private actor cannot be liable "simply because she is compelled to take an action by a state actor," it is "entirely proper to find that the state actor engaged in state action, including whatever actions the private party was compelled to undertake"); *see also United States v. Booker*, 728 F.3d 535, 540 (6th Cir. 2013) ("When police officers bring a suspect in custody to a purportedly independent actor, and stand by without interfering while the actor unlawfully batters the subject in a way that the police clearly could not, it can hardly be argued that resulting evidence is admissible.").

## B. Fourth Amendment Claim

### 1. Reasonableness of the Search

Because we hold that Officers Freeman and Johnson could be held responsible for the procedures performed by Dr. Edholm, we now turn to the question whether, taking the facts in the light most favorable to George, this search was unconstitutional. *See Saucier*, 533 U.S. at 201.

The Fourth Amendment requires that a nonconsensual physical search of a suspect's body, like any other nonconsensual search, be reasonable. *See Winston v. Lee*, 470 U.S. 753, 759–60 (1985). A body search, however,

requires "a more substantial justification" than other searches. *Id.* at 767. In *Winston*, the Supreme Court rejected the state's request for a court order requiring a suspect to undergo surgery to remove a bullet from the suspect's chest. *Id.* at 755. In holding that the forced surgery would be unconstitutional, the Court identified three primary factors courts should weigh in deciding the reasonableness of a body search. Those factors are (1) "the extent to which the procedure may threaten the safety or health of the individual," (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity," and (3) "the community's interest in fairly and accurately determining guilt or innocence." *Id.* at 761–62. The failure to obtain a warrant, while not necessarily fatal to a claim of reasonableness, is also relevant. *See id.* at 761; *United States v. Cameron*, 538 F.2d 254, 259 (9th Cir. 1976).

The foundational case is *Rochin v. California*, 342 U.S. 165 (1952), in which police officers entered Rochin's house and saw him swallow two capsules of morphine. *Id.* at 166. The officers took Rochin to a hospital, where "[a]t the direction of one of the officers a doctor forced an emetic solution through a tube into Rochin's stomach against his will." *Id.* Rochin vomited up the morphine capsules, which the prosecution then introduced as evidence at trial. *Id.* The Court reversed, holding that the forcible stomach-pumping "shock[ed] the conscience" and was "too close to the rack and the screw" to survive constitutional scrutiny. *Id.* at 172. Though *Rochin* was decided under the Due Process Clause of the Fourteenth Amendment, the Court has made clear it would now "be treated under the Fourth Amendment, albeit with the same result." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 n.9 (1998).

Analyzing the *Winston* factors in light of *Rochin*, we hold that there is evidence in the record, viewed in the light most favorable to George, that would support a finding that Officers Freeman and Johnson violated George's Fourth Amendment rights. We address the *Winston* factors in turn.

First, the danger to George's health and safety from the procedures performed in the hospital appears to have been slight, though not nonexistent. Neither George nor the officers have provided evidence of the general risks (or lack thereof) of sedation, anoscopy, intubation, and bowel evacuation. George testified, however, that the anoscopy caused him significant pain and anal bleeding that continued after he left the hospital.

Second, the "intrusion upon [George's] dignitary interests in personal privacy and bodily integrity" was extreme. *Winston*, 470 U.S. at 761. Edholm sedated George. He opened George's anus with an anoscope and inserted long forceps into George's rectum. He inserted a tube into George's nose, ran the tube into George's stomach, and pumped a gallon of liquid laxative through George's digestive system, triggering a complete evacuation of George's bowels. When George regained consciousness, the bowel evacuation was still in process. George did not consent to any of these procedures. The officers neither had a warrant authorizing these procedures nor attempted to get one.

These procedures were "highly intrusive and humiliating." *Tribble v. Gardner*, 860 F.2d 321, 324 (9th Cir. 1988). The search invaded George's anus and nostrils, as well as his throat, stomach, and intestines. The anoscopy "targeted an area of the body that is highly personal and private." *United States v. Gray*, 669 F.3d 556, 564 (5th Cir.

2012), *vacated on other grounds*, 133 S. Ct. 151 (2012). Forced sedation, anoscopy, intubation, and bowel evacuation are more invasive than the stomach-pumping that *Rochin* described as "close to the rack and screw." 342 U.S. at 172; *accord United States v. Booker*, 728 F.3d 535, 545 (6th Cir. 2013). If George's evidence is believed, the procedures were performed despite his vociferous protests and without explanation, consultation, or other "reasonable steps to mitigate [his] anxiety, discomfort, and humiliation." *Cameron*, 538 F.2d at 258; *see also Winston*, 470 U.S. at 765 ("[T]o take control of respondent's body, to drug this citizen—not yet convicted of a criminal offense—with narcotics and barbiturates into a state of unconsciousness, and then to search beneath his skin for evidence of a crime . . . involves a virtually total divestment of respondent's ordinary control over surgical probing beneath his skin." (citation and internal quotation marks omitted)).

The search here was at least as invasive as searches we and other courts have characterized as unwarranted intrusions on dignitary interests. In *United States v. Cameron*, a suspect underwent a digital rectal exam and two enemas before being forced to drink a liquid laxative. 538 F.2d at 258. In an opinion by then-Judge Kennedy, we held that search unreasonable. *Id.* at 258–60. In *Ellis v. City of San Diego*, 176 F.3d 1183 (9th Cir. 1999), we held that the plaintiff had alleged a clear Fourth Amendment violation when he claimed that doctors sedated him, took blood samples, and inserted a catheter into his penis. *Id.* at 1186, 1191–92; *see also Booker*, 728 F.3d at 547 (sedation, intubation, and anal probing are "an affront to personal dignity . . . categorically greater" than the surgery in *Winston*); *Gray*, 669 F.3d at 564 (proctoscopy is "a greater affront to . . . dignitary interest[s] than full-on exploratory surgery"); *United States v. Husband*,

226 F.3d 626, 632 (7th Cir. 2000) (sedation and reaching into suspect's mouth "constitute a serious invasion of . . . personal privacy and liberty interests"); *Rodriques v. Furtado*, 950 F.2d 805, 811 (1st Cir. 1991) (vaginal inspection is "a drastic and total intrusion of . . . personal privacy and security"); *Kennedy v. L.A. Police Dep't*, 901 F.2d 702, 711 (9th Cir. 1989) (visual inspections of body cavities are "dehumanizing and humiliating"), *abrogated on other grounds by Hunter v. Bryant*, 502 U.S. 224 (1991) (per curiam); *Tribble*, 860 F.2d at 325 (digital rectal exam is "one of the most intrusive methods of detecting contraband"); *Yanez v. Romero*, 619 F.2d 851, 855 (10th Cir. 1980) (catheterization is a "gross personal indignity"); *Huguez v. United States*, 406 F.2d 366, 379 (9th Cir. 1968) (digital rectal exam was "a brutal invasion of privacy"); *State v. Payano-Roman*, 714 N.W.2d 548, 560 (Wis. 2006) (being forced to drink a laxative is a "significant intrusion").

Intrusive body searches are permissible when they are reasonably necessary to respond to an immediate medical emergency. *See Husband*, 226 F.3d at 635; *People v. Bracamonte*, 540 P.2d 624, 629 (Cal. 1975). Officers Freeman and Johnson contend that such an emergency existed because of the risk that the baggie of cocaine base in George's rectum would rupture. They contend that the procedures performed by Dr. Edholm were necessary to save George's life. But "since the suspect himself would have been responsible for any such [medical] risk, only a showing of the greatest imminent harm would justify intrusive action for the purpose of removal of the drug." *Cameron*, 538 F.2d at 259 n.8.

Freeman and Johnson rely heavily on Dr. Edholm's testimony that the procedures were "life-saving treatment"

necessary to address the risk that the baggie of cocaine base in George's rectum would rupture. But Edholm's testimony would be of limited use if a jury concluded that Freeman and Johnson were the source of false information leading Edholm to believe that a life-threatening emergency existed. Edholm never testified that he believed the baggie had actually ruptured. He testified only that it could rupture: "If the golf ball size amount of cocaine in his rectum had ruptured, he likely would have died that evening." As to "drug-packing" in general, Edholm testified that "if you don't get the drugs out, then they can rupture." Edholm did not testify that he had any reason to think the baggie in George's rectum was more likely to rupture than in any other drug-packing case.

Viewing the evidence in the light most favorable to George, a reasonable jury could conclude that the only actual risk to George's health was the possibility that the baggie of cocaine base *could* rupture. That sort of speculative, generalized risk cannot on its own justify nonconsensual procedures as invasive as those performed by Dr. Edholm. Every person who hides a baggie of drugs in his rectum faces a risk that the baggie will rupture. But the mere fact "that the suspect is concealing contraband does not authorize government officials to resort to any and all means at their disposal to retrieve it." *Cameron*, 538 F.2d at 258; *see Winston*, 470 U.S. at 767. Otherwise, highly invasive searches of drug-packing suspects' rectums would never violate the Fourth Amendment. That clearly is not the law. *See Rochin*, 342 U.S. at 172; *Cameron*, 538 F.2d at 256–59; *Bracamonte*, 540 P.2d at 628–31.

The record could support a jury conclusion that the search was not reasonably necessary to address the risk of rupture of the baggie in George's rectum. Officers Freeman and

Johnson both testified they had seen doctors allow suspects with drugs in their rectums to pass the drugs naturally, using only laxatives, including one suspect who had a "very high" heart rate and, as a result, was placed in intensive care. A rational jury could thus find that the potential risk of rupture could be adequately addressed by keeping George in the hospital and monitoring his bowel movements. *See United States v. Aman*, 624 F.2d 911, 913 (9th Cir. 1980) (allowing police to hold drug-packing suspect "where medical personnel and facilities were immediately available" in case the package ruptured); *Cameron*, 538 F.2d at 258 & n.7.

Third, we weigh the intrusiveness of the search against "the community's interest in fairly and accurately determining guilt or innocence." *Winston*, 470 U.S. at 762. The community has a strong interest in prosecuting those who are selling cocaine base, and George likely could not have been prosecuted without the evidence he had hidden in his rectum. But a jury could reasonably conclude that the baggie of cocaine base could have been recovered through far less intrusive means. If George's life was not in immediate jeopardy, doctors could have kept him in the hospital, administered laxatives, and monitored his bowel movements. *See Cameron*, 538 F.2d at 258. Further, if that course of treatment had been followed, the officers then would have had time to seek a search warrant. *See United States v. Erwin*, 625 F.2d 838, 841 (9th Cir. 1980). Under these circumstances, the intrusiveness of the search far exceeded what was necessary to serve the community's interest in recovering evidence of George's crime.

We therefore hold, based on the *Winston* factors, that a jury could conclude the procedures performed by Dr. Edholm violated the Fourth Amendment.

## 2. Qualified Immunity

Even if Officers Freeman and Johnson violated George's Fourth Amendment rights, they are entitled to qualified immunity if those rights were not "clearly established" at the time of the search. *See Stanton v. Sims*, 134 S. Ct. 3, 4–5 (2013) (per curiam); *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). For a right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Viewing the evidence in the light most favorable to George, we hold that Freeman and Johnson are not entitled to qualified immunity on the Fourth Amendment claim.

George has provided evidence that would support a jury conclusion that Freeman and Johnson gave false information to Dr. Edholm, and that this false information induced Edholm to perform unconstitutionally intrusive procedures that he would not otherwise have performed. "[E]very reasonable official would have understood" that conduct to violate the Fourth Amendment. *al-Kidd*, 131 S. Ct. at 2083 (internal quotation mark omitted). We reach this decision based on Supreme Court precedent, "cases of controlling authority in [the officers'] jurisdiction," and "a consensus of cases of persuasive authority." *Wilson v. Layne*, 526 U.S. 603, 615–17 (1999).

First, it was clearly established that a private citizen's search may be attributed to the police when the "the private party act[s] as an instrument or agent of the Government" in conducting the search. *Skinner*, 489 U.S. at 614. That principle had been repeatedly and clearly applied to doctors' searches of suspects' bodies. *See, e.g.*, *Ellis*, 176 F.3d at

1191–92 (applying the Fourth Amendment to doctor and nurse's actions performed based on police instruction); *Cameron*, 538 F.2d at 256–60 (same); *Bracamonte*, 540 P.2d at 626–31 (same).  No reasonable officer could have believed that he could avoid responsibility for an unconstitutional search by using deception to induce a private party to perform the search.  The Supreme Court has deemed that principle so obvious as to be "axiomatic."  *Norwood*, 413 U.S. at 465.  The Court wrote, "[A] state may not induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish."  *Id.* (internal quotation marks omitted).

Second, it was clearly established that a search of a patient's body must be reasonable.  Se*e Winston*, 470 U.S. at 759–62; *Cameron*, 538 F.2d at 257–59.  As we explained above, forced sedation, anoscopy, intubation, insertion of a nasogastric tube, and bowel evacuation are more intrusive than the stomach-pumping rejected in *Rochin*, and at least as intrusive as other searches characterized as highly invasive by courts across the country.  *See, e.g.*, *Husband*, 226 F.3d at 632; *Rodriques*, 950 F.2d at 811; *Kennedy*, 901 F.2d at 712; *Tribble*, 860 F.2d at 325; *Yanez*, 619 F.2d at 855; *Huguez*, 406 F.2d at 379; *Bracamonte*, 540 P.2d at 631.  Case law clearly established that the possibility that a baggie of drugs could rupture, standing alone, cannot justify a warrantless search as intrusive as that conducted here.  *See, e.g.*, *Rochin*, 342 U.S. at 172; *Cameron*, 538 F.2d at 258, 259 n.8; *Utah v. Hodson*, 907 P.2d 1155, 1158 (Utah 1995).  Indeed, the California Supreme Court so held nearly thirty years before the search in this case.  *Bracamonte*, 540 P.2d at 629 & n.5; *see Stanton*, 134 S. Ct. at 7 (finding important the holdings of courts in the jurisdiction where officials act); *al-Kidd*, 131 S. Ct. at 2086–87 (Kennedy, J., concurring) (same).

### C.  Fourteenth Amendment Claim

In addition to his claim under the Fourth Amendment, which applies to the states through the Fourteenth Amendment, *see Mapp v. Ohio*, 367 U.S. 643, 654–55 (1961), George brings a separate Fourteenth Amendment claim based on his right to refuse unwanted medical treatment, *see Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990).  We do not reach the merits of this claim, *see C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 978 (9th Cir. 2011), but hold that Freeman and Johnson are entitled to qualified immunity.

George has not identified a single case finding a Fourteenth Amendment violation under circumstances like those here.  He cites the Seventh Circuit's decision in *United States v. Husband*, 226 F.3d at 632, but the court in that case considered the right to refuse medical treatment only as a factor in analyzing a Fourth Amendment claim.  George relies primarily on cases dealing either with the treatment of persons in vegetative states, *see Cruzan*, 497 U.S. at 265, or with the use of medication to render criminal defendants competent to stand trial, *see Riggins v. Nevada*, 504 U.S. 127, 133–38 (1992); *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1133 (9th Cir. 2005); *see also Benson v. Terhune*, 304 F.3d 874, 880–85 (9th Cir. 2002).  Those cases are "readily distinguishable." *Stanton*, 134 S. Ct. at 7.  Based on the cases cited to us by George, we cannot say that "every reasonable official" would have known the procedures performed by Dr. Edholm violated the Fourteenth Amendment.  *al-Kidd*, 131 S. Ct. at 2083 (internal quotation mark omitted).

### D. Claims Against Edholm

In light of its ruling on Officers Freeman and Johnson's summary judgment motion, the district court suggested that George voluntarily dismiss without prejudice his claims against Dr. Edholm. Before George did so, however, the district court entered a final judgment dismissing George's complaint in its entirety. One day later, George filed a notice of dismissal under Federal Rule of Civil Procedure 41(a)(1)(A)(i). George now argues his voluntary dismissal was a nullity because it followed the district court's order of final judgment. George cites no case on point, and our circuit does not appear to have addressed the issue. The district court may address that issue, as well as any others related to Edholm, on remand.

### Conclusion

We reverse the grant of summary judgment to Officers Freeman and Johnson on George's Fourth Amendment claim. We affirm the grant of summary judgment on his Fourteenth Amendment claim. We decline to address issues related to Dr. Edholm. Each party shall bear its own costs on appeal.

**REVERSED in part, AFFIRMED in part, and REMANDED.**