**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0215n.06

Case No. 15-5095

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Apr 20, 2016

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| BILLY JEROME SHEPHERD, | ) | KENTUCKY |
| | ) | |
| Defendant - Appellant. | ) | |

BEFORE: BOGGS and KETHLEDGE, Circuit Judges; STAFFORD, District Judge.[*]

BOGGS, Circuit Judge. Billy Shepherd was convicted of possession of and conspiracy to distribute controlled substances, which were recovered from his rectum. When Shepherd was non-responsive and appeared unconscious after his arrest, police officers took him to an emergency room where they relayed to the attending physician their suspicion that Shepherd had drugs hidden in his rectum. The physician evaluated Shepherd by x-ray and CT scan without his consent. In the circumstances of this case, those unconsented procedures cannot be attributed to the state for Fourth Amendment purposes. Accordingly, the medical information gathered from the examination could be used to apply for a search warrant. We affirm Shepherd's conviction.

---

[*] The Honorable William Henry Stafford, Jr., United States District Judge for the Northern District of Florida, sitting by designation.

## I

In May 2013, John Dawson drove Shepherd, Shepherd's girlfriend Amy Slone, and John Barnett from Floyd County, Kentucky to buy drugs in Columbus, Ohio. Barnett placed an order with Robert Haddox, his Columbus contact. Shepherd brought the funds. In Columbus, Haddox drove Barnett and Shepherd to a trailer where Shepherd paid $1800 for about an ounce of heroin. When they returned to Dawson's vehicle, Shepherd rebuffed Slone's efforts to take some of the heroin. At another trailer, Shepherd bought about 3.5 grams of cocaine and 36 oxycodone pills. Members of the group took drugs at the second trailer. A later toxicology report on Shepherd's urine returned positive for cocaine but negative for heroin or oxycodone. On the drive back, Shepherd told Dawson to "get up with John Barnett, if [Dawson] couldn't find [Shepherd], if [Dawson] needed a good deal." Things went smoothly until they crossed into Floyd County. Unbeknownst to the others, Dawson was an informant, his vehicle was equipped with a tracking device, and he had been in communication with the police.

Just inside Floyd County, a team of state and federal law enforcement stopped the vehicle. A pat-down search of Shepherd uncovered drug paraphernalia, but no drugs. But officers suspected that Shepherd had controlled substances in his rectum. Barnett and Dawson told police that Shepherd had drugs in his "pelvic area," and Shepherd smelled like feces.

Shepherd was arrested and placed in the back seat of a cruiser. The plan was to "dry cell" him at the Floyd County Detention Center.[1] That plan changed on the drive to the detention center. Shepherd spoke incomprehensibly and "flopped over" when the cruiser rounded a curve. Fearing that Shepherd had a bag in his rectum that contained drugs and had ruptured, the officer

---

[1] "Dry celling" is a method of recovering drugs suspected of being hidden in an individual's rectum. The person is placed in a holding cell without water access or where water access has been interrupted so that police can scan bowel movement contents. **R. 242 at 946.**

driving the cruiser pulled over. He could not elicit a verbal response from Shepherd who appeared to go "in and out of consciousness."

The officers became worried that Shepherd's life was at risk and drove to the nearest emergency room. They relayed their concerns to the attending physician, Dr. Andrew Mutiso, who instructed them to bring Shepherd inside. Mutiso listened to Shepherd's lungs and conducted a neurological examination. Shepherd appeared a "little dazed" but was otherwise "in a normal state." Officers restrained Shepherd because he was physically and verbally combative. After the physical examination, Mutiso evaluated Shepherd by x-ray to "ascertain . . . what was going on." It showed an "abnormal density superimposed in the lower pelvis, [which] may represent foreign material in the rectum." Mutiso next tried to conduct a digital rectal examination but Shepherd refused consent. So Mutiso decided to evaluate him by CT scan, which confirmed "a foreign body in the rectum . . . with [the] hyper-density, [and] appearance of multiple capsules." Mutiso again tried to perform a digital rectal examination because the capsules "could pose a danger to [Shepherd] if they busted." Shepherd refused consent.

At this point, Mutiso determined, as he testified at a suppression hearing, that the "emergency . . . had elapsed." He informed the officers that they had two options: (1) Wait for Shepherd to excrete the substance by passing a bowel movement, which presented the risk of injury or death if it ruptured and absorbed into his system; or (2) obtain a warrant to sedate him and remove it. Mutiso believed that the latter was a better option to "assure that [Shepherd] was safe and that he would not suffer any danger."

Police obtained a search warrant from the Floyd County District Court based on: Shepherd smelling of feces; an anonymous tip that Shepherd was transporting illegal drugs; the officer's knowledge of and experience with drug smuggling through body cavities; and Mutiso's

3

examination. Mutiso then sedated Shepherd. He removed from Shepherd's rectum a bag containing 21.99 grams of heroin, 36 oxycodone pills, and 1.045 grams of crack cocaine.

A grand jury charged Shepherd with conspiracy to distribute controlled substances, 21 U.S.C. § 846, and possession with intent to distribute controlled substances, 21 U.S.C. § 841(a)(1). Shepherd moved to suppress evidence obtained from the search of his rectum. He alleged, inter alia, that Mutiso's pre-warrant evaluation by x-ray and CT scan violated his Fourth Amendment rights. At a suppression hearing, Mutiso testified that the officers had not influenced his examination and that he "was the one examining [Shepherd] and deciding what to do." A magistrate judge recommended finding that Mutiso was not a government agent for Fourth Amendment purposes. The district court adopted that conclusion and denied the motion.

Shepherd's case proceeded to a jury trial. In his defense, Shepherd argued that he was a heroin addict hiding in the mountains because of outstanding warrants. To avoid police detection, Shepherd testified, he purchased illegal drugs for personal use only in the largest quantity that he could afford "so [he] didn't have to come back out of the hills to go get more." The jury convicted Shepherd on the conspiracy count, acquitted him of possession with intent to distribute, but convicted him on the lesser charge of possession of a controlled substance, 21 U.S.C. § 844. The district court sentenced Shepherd to 320 months of imprisonment.

On appeal, Shepherd challenges the district court's ruling on his suppression motion, the sufficiency of the evidence to sustain the conspiracy conviction, and the inconsistency of the jury's verdict.

II

In assessing a trial court's ruling on a motion to suppress, we review its factual findings for clear error and its legal determinations de novo. *United States v. Levenderis*, 806 F.3d 390,

399 (6th Cir. 2015). Shepherd argues that Mutiso acted as a government agent when he evaluated Shepherd by x-ray and CT scan. As explained below, we agree with the district court that Mutiso was not acting as a government agent.

The Supreme Court has "consistently construed" the Fourth Amendment's protection against unreasonable searches "as proscribing only governmental action." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). It can apply to private individuals, but only when they act as government "agent[s]" or with a government official's "participation or knowledge." *Ibid.* (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)). Later cases have emphasized that a private party's search is attributable to the government only "if the private party acted as an instrument or agent of the Government." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 614 (1989); *see, e.g.*, *United States v. Clutter*, 914 F.2d 775, 778 (6th Cir. 1990). That "necessarily turns on the degree of the Government's participation in the private party's activities." *Skinner*, 489 U.S. at 614. In the context of a search, the defendant must demonstrate two facts: (1) Law enforcement "instigated, encouraged or participated in the search" and (2) the individual "engaged in the search with the intent of assisting the police in their investigative efforts." *United States v. Hardin*, 539 F.3d 404, 419 (6th Cir. 2008) (quoting *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985)).

Shepherd rests his argument on similarities between his case and *United States v. Booker*, 728 F.3d 535 (6th Cir. 2013). Given the fact-specific nature of Fourth Amendment analysis, *Missouri v. McNeely*, 133 S. Ct. 1552, 1559 (2013), we summarize the salient events of *Booker* here. After an arrest, police grew suspicious that Booker was hiding drugs in his rectum. He tried to reach into the back of his pants several times and was uncooperative when an officer detected an object during a strip search. 728 F.3d at 537–38. Even though Booker displayed no

5

physical symptoms, he was transferred from a detention facility to a medical center. *Id.* at 538. Before arriving, an officer relayed to the attending emergency-room physician his suspicion that Booker had drugs in his rectum. *Ibid.* Booker's evaluation was the third time in three years that the department had brought a suspect to this physician to perform a digital rectal examination. *Ibid.* At the hospital, Booker displayed normal vital signs and denied the allegation. *Id.* at 539. The physician explained to Booker his duty to remove the drugs if the officers' suspicion proved correct. *Ibid.* Booker refused consent for the examination and the physician's first attempt to perform it was unsuccessful. *Ibid.* So Booker was injected with muscle relaxants and, later, a sedative and a paralytic agent. While Booker was unconscious, intubated, and paralyzed, the physician removed a five-gram rock of crack cocaine from his rectum. *Ibid.*

The physician, we held, was used "as a tool to perform a search." *Id.* at 543. His conduct was attributable to the state because the police had physical control of Booker, knew what the doctor was going to do, and knew that Booker did not consent. *Id.* at 541. No reasonable officer could have believed that the search—paralyzing, intubating, and performing a digital rectal examination over a competent patient's clear refusal to consent—would have occurred without police direction. *Id.* at 542.

At first blush, the facts of *Booker* seem analogous to those here. Both cases involve an individual in police custody transported to a hospital where an emergency-room physician performed invasive medical procedures. Yet important differences between the cases require us to reach the opposite conclusion. On the "unusual" facts of *Booker*, the officers encouraged the physician's actions. *Id.* at 545. The defendant displayed no physical symptoms but was taken to the hospital to instigate a search; absent police direction, the physician's conduct would have

been tortious; and the officers "knew" what the physician would do, in part because the department had sought his assistance with the same procedure twice before. *Id.* at 541.

By contrast, police here responded to what they perceived as a medical emergency, which weighs against a finding that they acted in a premeditated way to instigate or encourage the search. Circumstantial evidence (the smell of feces, his co-conspirators' statements, recovered drug paraphernalia) reasonably made the arresting officers suspicious that drugs were hidden in Shepherd's rectum. This became a safety concern on the drive to the detention center. Shepherd was nonresponsive, "flopped over" when the cruiser rounded a curve, and then lay semi-conscious in the back seat. Police brought him to the nearest hospital—not one handpicked for a physician experienced in aiding officers with digital rectal examinations. Shepherd presents no evidence that the officers gave false information about his medical condition or "knew" what Mutiso would do. (Both factors that could contribute to a showing that the state instigated or encouraged a body search.) *Cf. George v. Edholm*, 752 F.3d 1206, 1215 (9th Cir. 2014); *Booker*, 728 F.3d at 541. Consistent with the duty to provide medical care to an individual in police custody, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), the officers explained to the physician their theory of Shepherd's condition. Mutiso testified at the suppression hearing that the officers did not influence his decision to evaluate Shepherd by x-ray and CT scan. Their rational response to a medical emergency bears no indicia of the calculation present in *Booker*.

Nor did Mutiso's actions indicate any illegitimate motive on his part. In *Booker*, the failure to provide the arrestee the option of using a toilet to resolve the medical emergency "showed that [the physician] was acting at least in part to ensure retrieval of the hidden drugs." 728 F.3d at 545. Here, after Mutiso conducted the x-ray and CT scan searches (which were indicated in his medical judgment) and determined that the emergency had elapsed, Shepherd

refused a digital examination. Mutiso did not proceed. Instead, he advised the officers that unless they obtained a warrant, he would not provide additional treatment except if another emergency arose.

Whereas the actions of the physician in *Booker* guaranteed the drugs' retrieval, Mutiso's x-ray and CT scan did not. At each point in Shepherd's treatment, the medical staff did no more than what was necessary to ascertain whether the medical emergency had elapsed. *Cf. United States v. Chukwubike*, 956 F.2d 209, 212 (9th Cir. 1992). Mutiso honored Shepherd's refusal of consent and made clear that he would proceed only in the face of another medical emergency, or a warrant. Those decisions demonstrate that Mutiso acted in pursuit of Shepherd's medical well-being rather than to help the police retrieve the drugs.

As the district court astutely noted, Mutiso's conduct assisted the officers in their affirmative duty to safeguard individuals in their control. *See Davis v. Brady*, 143 F.3d 1021, 1024 (6th Cir. 1998) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)). The Fourth Amendment protection against unreasonable searches does not always trump the state's constitutional duty to protect those whom it restrains. In every medical emergency involving an individual whose liberty the state has limited, "antecedent contact" between the government and medical staff is inevitable. *Lambert*, 771 F.2d at 89. The pertinent question in that context is whether the contact arises in an effort to aid law enforcement in their duty to provide medical care, rather than to advance a search. Contact between Mutiso and the officers arose in service of that duty alone.

Shepherd's pre-warrant medical evaluation, which ended after the physician determined that his condition was not life-threatening, did not constitute a Fourth Amendment search. We therefore do not consider the Government's alternative arguments. It bears emphasis, however,

that neither an x-ray nor a CT scan is as invasive as the forced paralysis, intubation, and digital rectal examination at issue in *Booker*, or the stomach pumping to which the *Booker* court analogized. *See* 728 F.3d at 545 (citing *Rochin v. California*, 342 U.S. 165 (1952)). In fact, when assessing the reasonableness of body-search techniques conducted by physicians acting as government agents, we have considered the availability of medical imaging as a less intrusive alternative. *See id.* at 547; *see also Sanchez v. Pereira-Castillo*, 590 F.3d 31, 45 (1st Cir. 2009).

### III

Shepherd also argues that the jury was presented with insufficient evidence to find him guilty of participating in a conspiracy to distribute controlled substances. In doing so, he shoulders a heavy burden. *See United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999). We review his claim de novo and reverse "only if the judgment is not supported by substantial and competent evidence upon the record as a whole." *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008).

This requires us to "examine the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Ibid.* As such, we make all reasonable inferences and resolve credibility issues in favor of the jury's verdict. *United States v. Wade*, 318 F.3d 698, 701 (6th Cir. 2003). Circumstantial evidence receives the same weight as direct evidence and may be sufficient alone to sustain a conviction. *See United States v. Jackson*, 622 F. App'x 526, 527 (6th Cir. 2015) (quoting *United States v. Wettstain*, 618 F.3d 577, 587 (6th Cir. 2010), and *United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993)). Circumstantial evidence "need not remove every reasonable hypothesis except that of guilt," *United States v. Vannerson*, 786 F.2d

221, 225 (6th Cir. 1986), but should not "require[] a leap of faith in order to support a conviction," *United States v. White*, 932 F.2d 588, 590 (6th Cir. 1991) (per curiam).

"To prove a conspiracy under 21 U.S.C. § 846, the government [must] prove, beyond a reasonable doubt, '(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy.'" *United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir. 2014) (quoting *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999)). Shepherd was convicted of conspiring to violate 21 U.S.C. § 841(a), which proscribes the knowing or intentional distribution of a controlled substance. His conviction was based on insufficient evidence, Shepherd argues, because his is the "most reasonable" theory of the case. According to that theory, Shepherd was an addict living on the lam who purchased illegal drugs for personal use only, but did so in bulk to decrease the chance of police detection.

The Government presented sufficient circumstantial evidence for a rational trier of fact to find Shepherd guilty on the conspiracy count. Shepherd and three others drove from Floyd County to Columbus where they purchased heroin, crack cocaine, and oxycodone. Shepherd provided cash for the transaction and concealed the drugs in his rectum when law enforcement stopped the vehicle. On the drive back, Shepherd offered Dawson a "good deal" on heroin. Shepherd's toxicology report was negative for heroin or oxycodone. He did not allow Stone to use the heroin. Contrary to Shepherd's assertion, that evidence does not also need to exclude every other reasonable hypothesis. *See, e.g.*, *United States v. Mack*, 808 F.3d 1074, 1080 (6th Cir. 2015). Based on this substantial circumstantial evidence, a rational trier of fact could have concluded that Shepherd knowingly participated in an agreement to distribute controlled substances.

IV

"[I]nconsistent jury verdicts may be enforced." *Bradshaw v. Stumpf*, 545 U.S. 175, 189 (2005) (Souter, J., concurring); *see also United States v. Clemmer*, 918 F.2d 570, 573 (6th Cir. 1990). They are not usually reviewable on appeal. *United States v. Lawrence*, 555 F.3d 254, 262 (6th Cir. 2009). To the extent that a criminal defendant contests the rationality of the jury's verdict, the appropriate vehicle is a sufficiency-of-the-evidence claim. *United States v. Powell*, 469 U.S. 57, 66 (1984). Shepherd brought such a challenge, and we were unconvinced. *See supra* Part III.

Shepherd contends that the jury behaved irrationally by convicting him of conspiracy and acquitting him of possession with intent to distribute. His argument simply speculates that the alleged inconsistency was the product of "some error that worked against [hi]m" rather than the exercise of lenity. *Powell*, 469 U.S. at 66. "Courts properly avoid such explorations into the jury's sovereign space." *Yeager v. United States*, 557 U.S. 110, 122 (2009). Assuming arguendo that the jury's verdict was inconsistent, the evidence was nonetheless sufficient to sustain his conspiracy conviction. It cannot be said that his conspiracy conviction was erroneous and that the jury showed its true colors only when it acquitted him on the count of possession with intent to distribute. Defendants are "given the benefit of [an] acquittal on the counts on which [they are] acquitted, and it is neither irrational nor illogical to require [them] to accept the burden of conviction on the counts on which the jury convicted." *Powell*, 469 U.S. at 69. We therefore reject his claim.

V

Shepherd has not shown that the physician's actions amounted to a government search. Nor has he shown that the jury was presented with insufficient evidence to convict him of

conspiracy to distribute controlled substances.  We therefore AFFIRM the district court's denial

of Shepherd's suppression motion and AFFIRM its judgment.