**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 1, 2012

No. 10-11150

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

RONDRICK LAMAR GRAY,

Defendant–Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before BENAVIDES, PRADO, and GRAVES, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767 (1966). This case forces us to balance this fundamental interest in a person's bodily integrity and dignity against the significant need of law enforcement officers to unearth evidence of crime. Specifically, the Appellant Rondrick Gray was forced to undergo a proctoscopic examination under sedation pursuant to a warrant obtained on the police's belief that he was concealing crack cocaine in his rectum. Weighing the competing interests, we find that the search was unreasonable but that the evidence should not be suppressed because the police acted in good-faith reliance on a valid search warrant. Accordingly, we AFFIRM.

No. 10-11150

## I. FACTUAL AND PROCEDURAL BACKGROUND

On April 23, 2010, a confidential informant told San Angelo Police Department ("SAPD") Detective Hank Hethcock that Rondrick Gray was in possession of and selling crack cocaine. Based on the information about Gray's vehicle, SAPD Officers Garza and Elrod stopped Gray's vehicle and arrested him on outstanding warrants. At the time of the stop (around 3 p.m.), Gray was driving with a passenger, Selah Simmons, who was taken into custody as well. Simmons told SAPD Sergeant Dornhecker that as the police were approaching Gray's vehicle during the traffic stop, Gray threw a plastic bag containing what she believed to be crack cocaine at her and asked her to conceal it, which Simmons refused to do. SAPD officers conducted a search of Gray's vehicle for the drugs but found nothing. Garza conducted a search of Gray, which also did not turn up any drugs. A K-9 unit arrived, and a drug dog alerted on the center console area of Gray's vehicle, but no drugs were found.

Gray was taken to the jail, where upon his arrival a strip search was conducted. Garza, who witnessed the strip search of Gray, described Gray as "not fully cooperative." Gray was placed into the general population of the jail, during which time he was not observed. While Gray was being searched and booked at the jail, SAPD officers did an extensive, two-hour search of Gray's vehicle, which also turned up nothing.

Gray was eventually taken out of the general population and strip-searched a second time with Garza and Elrod watching. As a part of his strip search, he was instructed to squat, pull his buttocks apart, and cough, in order to dislodge anything that may be concealed in the anus. Gray was described as "being evasive," because he would only "slightly bend at the knees and give a faint cough." In addition to the two strip searches, SAPD did a second search of the scene where they stopped Gray, and jail personnel conducted strip searches

of all inmates who were in Gray's holding cell with him.  None of these searches turned up any drugs or other contraband.

At this point, Hethcock presented Gray with some options of how to proceed: Gray could undergo a third strip search, he could be placed in a cell with a waterless toilet, or he could consent to a rectal x-ray examination.  Gray did not consent to any of these options.  Based on all of these events and his education, training, and experience, Hethcock believed that the "only place" Gray could be concealing the crack cocaine that the police suspected him of possessing was in his rectum.  Hethcock informed Gray that the police would seek a search warrant to try to uncover the drugs.  By 10:15 p.m., Gray posted a bond on his traffic warrants and was released.  SAPD, however, detained Gray for thirty minutes while waiting to secure the search warrant.  At about 10:45 p.m., over seven hours after Gray's initial arrest, a state judge signed the search warrant, and Gray was taken to the hospital for the search.

The state judge found probable cause for a search based on Hethcock's affidavit.  The judge ordered Gray to be presented to a "qualified medical technician to examine [Gray] for the concealment of controlled substances and to remove said controlled substances from his body in accordance with recognized accepted medical procedure as described in [Hethcock's] affidavit."  Hethcock's affidavit, while it did state that the police suspected Gray of concealing crack cocaine in his "anal cavity," did not describe the medical procedure to be performed at all.  The only limitation on the procedure was the same as in the warrant itself—"in accordance with recognized medical procedures."

At the hospital, the first procedure performed was an x-ray using a portable x-ray machine.  Gray was, according to Hethcock, uncooperative with the x-ray technician and as a result, the technician was unable to "get a good picture with the portable x-ray."  The next procedure attempted was another x-

No. 10-11150

ray but this time using a stationary machine. At first, Gray was asked to do a standing x-ray, but Gray "refused to stay where he was told." The medical staff then tried to x-ray Gray while he was lying down, but Gray would not lie still. Eventually, the x-ray technician obtained a useable picture. From his review, he noticed something that he thought could either be a gas pocket or a foreign object but could not decide which. Hethcock took the x-ray to Dr. Roland Heidenhofer, a staff physician at the hospital, who also could not discern whether the anomaly was a gas pocket or a foreign object. Heidenhofer then went to Gray's room and informed Gray that he was going to perform a digital rectal examination on him. Though Hethcock described Gray as "evasive and uncooperative" during the digital exam, Heidenhofer was able to perform the digital exam to some extent. From that examination, however, he was unable to determine if there was an object in Gray's rectum.

After failing to determine anything from either the x-rays or the digital exam, Heidenhofer consulted with Dr. Emmette Flynn, the hospital's Trauma Medical Director. Flynn believed that the best next step was to perform a proctoscopic examination of Gray's rectum. In such an examination, the proctoscope, essentially an illuminated tube, is inserted across the anal canal and into the rectum. The rectum is then filled with air, or insufflated, so that the interior can be examined. When the rectum is insufflated, the walls are distended, which permits a more thorough evaluation of the wall of the rectum and objects within the rectal vault. Flynn stated that he did not ask for Gray's consent for the proctoscopic exam and that at the time he made the decision, he had not reviewed the search warrant or Gray's medical history. For Gray's proctoscopic exam, two sedatives (Versed and Etomidate) were administered to Gray intravenously. Though the doctors later testified at the suppression hearing that the risks associated with the sedatives were low, Gray was placed on a number of monitors to measure Gray's cardiovascular status during the

4

examination. The sedatives carry with them a risk of respiratory depression or arrest. Proctoscopy also has associated risks, including pain and potential anal bleeding or perforation. Flynn admitted that proctoscopic exams are usually not conducted on uncooperative patients. At the time that the doctors decided to perform the proctoscopic exam, there were other less intrusive means available to try to recover the suspected drugs, including a cathartic or an enema—neither of which would have involved sedation.

During the proctoscopy, Flynn was unable to completely visualize the rectal vault due to a "substantial amount of fecal debris." He did, however, intermittently see and feel something different from the other contents of the rectum. Flynn removed the scope and performed a second digital rectal examination, during which Flynn removed a plastic bag from Gray's rectal cavity. Flynn placed the plastic bag into a biohazard bag provided by the emergency department, and handed the bag to an SAPD officer. Subsequent testing revealed the contents of the bag recovered from Gray's rectum to be 9.62 grams of cocaine base.

The Government indicted Gray for possession of crack cocaine with intent to distribute. Gray moved to suppress the crack cocaine recovered during the proctoscopic examination. After a suppression hearing, the district court found the exclusionary rule inapplicable because the police had relied in good faith on a valid search warrant in recovering the crack cocaine and that, regardless, the crack cocaine would have been inevitably discovered. Overall, the district court found that "the search and seizure of Gray's person was reasonable considering the manner and means and justification for the search and seizure."

The Government proceeded to trial, which focused on Gray's intent to distribute. During the course of the trial, the Government introduced four photographs showing Gray posing with a gun. The district court admitted the photographs over Gray's objections on authentication, prior bad acts, prejudicial

No. 10-11150

effect, and Confrontation Clause grounds. At the close of evidence, Gray moved unsuccessfully for a judgment of acquittal. The jury convicted Gray of possession of five grams or more of crack cocaine with intent to distribute. The district court sentenced Gray to the statutory mandatory minimum under the pre-Fair Sentencing Act regime—ten years imprisonment and eight years of supervised release. Gray timely appealed (1) whether the district court should have suppressed the crack cocaine recovered from Gray's rectum because the search was unreasonable and (2) whether the district court erred in admitting the four photographs of Gray posing with a gun.[1]

## II. DISCUSSION

### A.    Seizure of the Crack Cocaine

"When the district court denies a motion to suppress, we review factual findings for clear error and conclusions of law *de novo*." *United States v. Payne*, 341 F.3d 393, 399 (5th Cir. 2003) (citation omitted). "Evidence is considered in the light most favorable to the prevailing party. The ultimate conclusion about the constitutionality of the law enforcement conduct is reviewed de novo." *United States v. Roberts*, 612 F.3d 306, 309 (5th Cir. 2010) (internal quotation marks and citations omitted). This "ultimate conclusion," which is reviewed de novo, includes "the sufficiency of the warrant or the reasonableness of an officer's reliance on a warrant" for purposes of the good faith exception. *United States v. Allen*, 625 F.3d 830, 834 (5th Cir. 2010).

---

[1] Gray also appealed his sentence and argued that the Fair Sentencing Act of 2010 ("FSA") should apply retroactively where, as here, the defendant committed the illegal conduct prior to the enactment of the FSA but was not sentenced until after the FSA went into effect. This argument is foreclosed by our recent holding in *United States v. Tickles*, 661 F.3d 212 (5th Cir. 2011). Gray's counsel conceded this point at oral argument. Oral Argument at 0:19, *available at* http://www.ca5.uscourts.gov/OralArgRecordings/10/10-11150_12-7-2011.wma. In *Tickles*, we surveyed the existing case law on the retroactivity of the FSA and concluded that "the penalties prescribed by the FSA do not apply to federal criminal sentencing for illegal conduct that preceded the FSA's enactment." *Tickles*, 661 F.3d at 215.

No. 10-11150

### 1. Purposes of the Exclusionary Rule and the Good Faith Exception

In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court stated that the exclusionary rule is "a judicially created remedy," *id*. at 906, designed to deter police misconduct, *id*. at 918. Therefore, where a police officer "acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," *id*. at 920, "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id*. at 922. We have held that "[t]he good faith exception applies unless one of the four exceptions to it is present." *United States v. Foy*, 28 F.3d 464, 473 (5th Cir. 1994).

> Those exceptions are: "(1) If the issuing magistrate/judge was misled by information in an affidavit that the affiant knew was false or would have known except for reckless disregard of the truth; (2) where the issuing magistrate/judge wholly abandoned his or her judicial role; (3) where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid."

*Id*. at 473 n.20 (quoting *United States v. Webster*, 960 F.2d 1301, 1307 n.4 (5th Cir. 1992). In deciding on the applicability of the good faith exception, the "evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" *Allen*, 625 F.3d at 836 (quoting *Herring v. United States*, 555 U.S. 135, 143 (2009)). That is to say, the good faith exception applies unless "a reasonably well trained officer would

have known that the search was illegal despite the magistrate's authorization." *Id.* at 835 (quotation marks omitted).

## 2.     Good-Faith-First Two-Step

To effectuate the purposes of the exclusionary rule and the good faith exception in cases where we are asked to review the constitutionality of a seizure conducted pursuant to a search warrant, we employ a two-step inquiry. *Allen*, 625 F.3d at 835 (citing *United States v. Cherna*, 184 F.3d 403, 407 (5th Cir. 1999)). First, we determine the applicability of the good faith exception to the exclusionary rule. *Id.* (citing *Leon*, 468 U.S. at 920–21 (1984)). If the good faith exception applies, we affirm the district court's denial of the motion to suppress. *Id.* If we find the good faith exception inapplicable, we "determine[] whether the magistrate issuing the warrant had a 'substantial basis for believing there was probable cause for the search.'" *Id.* (quoting *United States v. Davis*, 226 F.3d 346, 351 (5th Cir. 2000)).

This case is different from *Allen* and the cases it cites because Gray's substantive challenge is not one claiming a lack of probable cause. Gray argues that the proctoscopy violated his right to "'personal privacy and dignity,'" as delineated in *Winston v. Lee*, 470 U.S. 753, 760 (1985) (quoting *Schmerber*, 384 U.S. at 767 (1966)). There, the Supreme Court dealt with an appeal of a permanent injunction issued by the district court enjoining the enforcement of a state court search warrant that authorized surgery under general anesthesia to retrieve a bullet that lodged in a suspect's chest during a robbery. *Id.* at 756–57. The Court affirmed the injunction because it found the ordering of the surgery to be unreasonable under the Fourth Amendment. *Id.* at 766. In so doing, it stated that "[t]he reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure." *Id.* at 760. The Court then elaborated a multi-factor balancing test,

No. 10-11150

based on *Schmerber*, that guides the analysis of the reasonableness of a medical procedure to obtain evidence. It noted that the "threshold requirements for . . . surgical search and seizure" were probable cause and the issuance of a warrant. *Id.* at 760–61. "Beyond these standards," a court reviewing the issuance of a warrant for medical searches should consider the "*magnitude* of the intrusion," defined as the "extent to which the procedure may threaten the safety or health of the individual" and the "*extent* of the intrusion upon the individual's dignitary interests in personal privacy and bodily integrity." *Id.* at 761 (emphasis added). The countervailing consideration is "the community's interest in fairly and accurately determining guilt or innocence." *Id.* at 762. Additionally, the Court thought it noteworthy that the suspect was afforded "a full measure of procedural protections," *id.* at 763; in fact, the state court held two evidentiary hearings before actually issuing the warrant, *id.* at 756–57.

Gray's challenge is distinct from the normal probable cause challenge because a probable cause determination considers only the police's evidence and not any additional countervailing liberty interest of the defendant. The Government argues that this good-faith-first two-step ought to be employed regardless of the substantive challenge. To be sure, the good-faith-first two-step is grounded in the "[p]rinciples of judicial restraint." *United States v. Craig*, 861 F.2d 818, 820 (5th Cir. 1988). But unwavering adherence to good-faith-first is not mandated by our precedent.[2] Quite the opposite, we depart from good-faith-

---

[2] The current framework is essentially a reverse of the familiar *Saucier* approach to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) (prescribing that courts should first consider the constitutional-violation prong before turning to the objective-reasonableness prong when deciding questions of qualified immunity), *overruled in part by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that it was no longer mandatory for courts to decide the constitutional-violation prong first); *see also Groh v. Ramirez*, 540 U.S. 551, 565 n.8 (2004) (describing the inquiry for good faith under the Fourth Amendment as the same as the objective-reasonableness prong under qualified immunity). The good-faith-first two-step goes one step further than *Pearson* does and mandates never reaching the constitutional violation until deciding that the officers were not objectively reasonable.

No. 10-11150

first when discussion by this court of the underlying substantive challenge will give "substantial guidance to lower courts and law enforcement officials." *Id*. at 821. Because, in our view, this is a case where "resolution" of the substantive challenge "is necessary to guide future action by law enforcement officers and magistrates," *Illinois v. Gates*, 462 U.S. 213, 265 41983) (White, J., concurring in the judgment), we find "compelling reasons" to justify departure from our normal good-faith-first approach. *Craig*, 861 F.2d at 821; *see also United States v. Husband*, 312 F.3d 247, 256 (7th Cir. 2002) (declining to reach the question of the good faith exception's applicability to warrants authorizing medical procedure searches).

### a.    Reasonableness of the Search

Applying the *Winston* factors to the present case, the magnitude/danger of the proctoscopy appears to be slight. Though the testimony reveals that there was some risk of respiratory depression or arrest associated with the sedatives administered and risk of anal bleeding or perforation associated with the use of the proctoscope, these risks were low in the hospital setting where the proctoscopy occurred. The risks here are obviously greater than the blood draw found permissible in *Schmerber*, 384 U.S. at 771 (allowing a blood draw to determine the blood alcohol level of a drunk driver), but they do not seem to rise to the level of the risks associated with the surgery found unreasonable in *Winston*, 470 U.S. 763–65.

On the extent of the intrusion factor, Gray argues that "[s]hy of full-on exploratory surgery [like in *Winston*], it is hard to imagine a more demeaning

---

*Compare Allen*, 625 F.3d at 835, *with Pearson*, 555 U.S. at 236 ("Although we now hold that the *Saucier* protocol should not be regarded as mandatory in all cases, we continue to recognize that it is often beneficial."). Unwavering adherence to good-faith-first will stagnate constitutional law in this area by completely shielding from review the magistrate's initial determination of whether to issue a medical procedures warrant. *Cf. Saucier*, 533 U.S. at 201.

No. 10-11150

and intrusive invasion of Gray's interests" in personal privacy and bodily integrity.  Br. of Defendant–Appellant at 29.  This is an understatement: the proctoscopy here was a greater affront to Gray's dignitary interest than full-on exploratory surgery.  Though sedated, Gray was conscious throughout the entire procedure.  Moreover, the procedure targeted an area of the body that is highly personal and private.  In our society, the though of medical technicians, under the direction of police officers, involuntarily sedating and anally probing a conscious person is jarring.  Such a procedure is degrading to the person being probed—both from his perspective and society's.  This type of search resembles the physical vaginal cavity search that the First Circuit encountered in *Rodriques v. Furtado*, 950 F.2d 805 (1st Cir. 1991).  There, the First Circuit said,

> [t]he invasion here was extreme, constituting a drastic and total intrusion of the personal privacy and security values shielded by the fourth amendment [sic] from unreasonable searches.  Searches of this nature instinctively give us cause for concern as they implicate and threaten the highest degree of dignity that we are entrusted to protect.

*Id.* at 811. In taking both of the individual interests into account, the magnitude of the intrusion from the proctoscopy was minimal, but the extent of intrusion from the proctoscopy was great.

Society's interest here, like in *Winston*, is "of great importance."  *Winston*, 470 U.S. at 762.  The interest is even greater than in *Winston*, where there was other evidence of guilt, *id.*, because the crack cocaine that Hethcock believed Gray was concealing in his anal cavity was the only direct evidence of Gray's possession.  Unlike in *Schmerber* or *Winston*, however, there were other available avenues for obtaining this evidence, such as a cathartic or an enema.  Such alternatives militate against society's great interest "in conducting *the* procedure" used in this case—proctoscopy.  *Id.* at 760 (emphasis added).

11

No. 10-11150

When balancing these interests and comparing them to our benchmarks of the permissible *Schmerber* blood draw and the impermissible *Winston* surgery, the medical danger here is slightly greater than in the former but nowhere near the danger of the latter. As to the dignitary interest, this is one of the greatest dignitary intrusions that could flow from a medical procedure—involuntary sedation for an anal probe where the person remains conscious. The last consideration is society's interests, which are not as great as in *Schmerber* but greater than in *Winston*. On balance, we find the proctoscopic search unreasonable due to the exceeding affront to Gray's dignitary interest and society's diminished interest in that specific procedure in light of other less invasive means.

### b.    Good Faith

As stated above, the good faith exception applies unless one of the four exceptions to it applies. *Foy*, 28 F.3d at 473. In this case, none of the exceptions to the good faith exception applies. The magistrate was neither misled nor abandoned his judicial role. The warrant was not so devoid of probable cause nor so lacking in particularity to say that "a reasonably well trained officer would have known that the search was illegal." *Allen*, 625 F.3d at 835. Where, as here, the magistrate issues a warrant that is more particularized than a search of the suspect's "person," *see United States v. Nelson*, 36 F.3d 758, 760–61 (8th Cir. 1994),[3] the warrant will not likely have any of the deficiencies identified by this court as a basis for not applying the good faith exception. That is to say a warrant, like the one at issue, that authorizes a medical procedure search of

---

[3] In *Nelson*, the Eighth Circuit found that the warrant failed the particularity requirement of the Warrant Clause because a "search warrant for appellant's 'person' was not sufficient to authorize a body cavity search." 36 F.3d at 760. It also found that the good faith exception was inapplicable because "even if we agree that the officers could have reasonably believed that the warrant included authorization for a body cavity search, there is no objectively reasonable basis for the officers' mistaken belief that the authorization contained in the warrant extended to the endoscopy." *Id.* at 761 (internal quotation marks omitted).

a specific area of the body but does not prescribe any off-limits procedures will be subject to good faith unless the police misled the magistrate, the magistrate abandoned her judicial role, or the warrant so clearly lacked probable cause. None of those situations exists in this case. This fact is of great concern to us because it seems that even if the magistrate were to authorize a medical procedure search that would violate the Fourth Amendment, like the general surgery found impermissible in *Winston*, there is no remedy for such a violation; the police officer's reliance on that warrant would be objectively reasonable. *See Leon*, 468 U.S. at 916; *see also United States v. Husband*, 226 F.3d 626, 636 (7th Cir. 2000) (Easterbrook, J., dissenting). Therefore, although we hold that the seizure is permissible under the good faith exception, we urge warrant-issuing magistrates to cabin the search warrant more than the "recognized medical procedure" language in this warrant. Additionally, we encourage magistrates, where feasible, to hold a hearing like in *Winston* to allow for more careful consideration of the competing interests at stake in each one of these medical procedure search cases. As the Court noted in *Winston*,

> [t]he Fourth Amendment is a vital safeguard of the right of the citizen to be free from unreasonable governmental intrusions into any area in which he has a reasonable expectation of privacy. [W]hen the State seeks to intrude upon an area in which our society recognizes a significantly heightened privacy interest, a more substantial justification is required to make the search "reasonable."

470 U.S. at 767.

## B.    Admission of the Photographs

Evidentiary rulings by the district court are reviewed for abuse of discretion, subject to harmless error review. *United States v. Jackson*, 636 F.3d 687, 692 (5th Cir. 2011). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Id.* (internal quotation marks omitted). Gray challenges the

admission of four photographs that depict him posing with a gun. He contends that these photographs were erroneously admitted because they were (1) not properly authenticated and (2) unfairly prejudicial.

### 1. Authentication

Federal Rule of Evidence 901(a) provides that "authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This standard is not a "burdensome one," *Jackson*, 636 F.3d at 693, as we do not "require conclusive proof of authenticity before allowing the admission of disputed evidence." *United States v. Watkins*, 591 F.3d 780, 787 (5th Cir. 2009). The Government used SAPD Detective Rodney Black to authenticate the photographs. He testified that the photographs were downloaded from Simmons's cell phone, which she authorized him to do, and that the pictures "appeared to be Mr. Gray holding a handgun or revolver." While usually a witness with personal knowledge would need to testify that the photographs accurately depict the scene at the time of their taking, *see* Kenneth S. Broun, 1 *McCormick on Evidence* § 52 (6th ed. 2006), here, the Government was not seeking to prove anything relating to the time that the pictures were taken, but rather that these were pictures of Gray holding a gun. Therefore, Black did not need to testify that the photographs were a true and accurate depiction of anything more than Gray holding a gun. Black had sufficient personal knowledge to testify that the photographs depicted Gray holing a gun. *See United States v. Jimenez Lopez*, 873 F.2d 769, 772 (5th Cir. 1989) ("Rule 901 does not limit the type of evidence allowed to authenticate a document.").

### 2. Prejudice

Gray also argues that it was error for the trial court to admit the photographs of him posing with a gun because of the minimal probative value of the photographs and the significant danger of unfair prejudice. The

No. 10-11150

Government argues that the photographs showing Gray with a gun is probative of Gray's intent to distribute the crack cocaine recovered from his person because "firearms are tools of the [drug] trade." *See United States v. Martinez*, 808 F.2d 1050, 1056–57 (5th Cir. 1987) (internal quotation marks omitted). *Martinez*, like the other cases the Government cites to, held that guns recovered from the same location where drugs were found is probative of intent.[4]  These cases do not support the conclusion that the fact that Gray held a gun (perhaps legally) in a photograph was probative of Gray's intent to distribute the crack cocaine found in him.  There was no probative value to the photographs, and therefore, the district court abused its discretion through its admission of the evidence.  *See United States v. Palmer*, 37 F.3d 1080, 1085 (5th Cir. 1994) (where evidence has no probative value, admission is clear error).

A finding that the district court abused its discretion in admitting the non-probative photographs does not, however, end our inquiry.  We must consider whether their admission was harmless error.  *Jackson*, 636 F.3d at 692.  Absent the photographs, the evidence relating to Gray's intent is the amount of the cocaine (street value of just over one thousand dollars) and the way the crack cocaine was divided (some in dealer sizes and other smaller pieces in user sizes).  There is "substantial evidence" supporting Gray's conviction, such that the outcome of the case would not be affected by the error.  *See United States v. Ramos-Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008).  Therefore, there is no reversible error based on the admission of the four photographs.

---

[4] *See United States v. Townsend*, 1999 WL 427597, at \*9 (unpublished) (introduction of forty-one guns found at defendant's home where the police also found crack cocaine not unduly prejudicial); *United States v. Gonzales*, 9 F.3d 103, at \*2 (1993) (per curiam) (introduction of a gun found in the defendant's car, which the police had seen the defendant run from carrying drugs, was not unduly prejudicial); *Martinez*, 808 F.3d at 1057 (introduction of guns found in defendant's car when he was arrested on drug-related charges was not unduly prejudicial).

No. 10-11150

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's admission of the crack cocaine and the four photographs of Gray posing with a gun.

AFFIRMED.