THISSEN, Justice.
*286 This case requires us to determine whether a body cavity search performed by forcing the appellant to be strapped down and sedated and to undergo an invasive anoscopy against his will was reasonable under the Fourth Amendment to the United States Constitution. We conclude that forcing appellant Guntallwon Karloyea Brown to undergo an anoscopy against his will and under sedation in the presence of nonmedical personnel is a serious invasion of Brown's dignitary interests in personal privacy and bodily integrity that outweighs the State's need to retrieve relevant evidence of drug possession. Accordingly, we reverse the court of appeals' decision. Because we hold that the evidence retrieved from the search must be suppressed, we remand to the district court for a new trial.
FACTS
On August 8, 2015, the Minneapolis Police Department was investigating the sale of crack cocaine by utilizing a confidential informant. The police and the confidential informant set up a controlled buy from Brown. Officers gave the confidential informant buy money and the confidential informant successfully bought a quantity of crack cocaine from Brown. The police later observed Brown perform a hand-to-hand transaction with a third party. After witnessing the transaction, the police arrested Brown for selling drugs.
During the arrest, a police officer witnessed Brown "shoving his hands down his pants, possibly concealing something." After Brown was transported to the station house, officers saw Brown "grinding his buttocks against the seat [of a chair]" in a "back and forth motion," "grinding his cheeks into the chair rail," and "taking his hands and shoving-kind of between his legs, shoving upwards."
The police officer observing Brown had handled "multiple cases where [individuals] conceal narcotics and contraband down their pants," and Brown's behavior led the officer to believe that he "was attempting to jam narcotics up his rectum." After getting approval from his supervisor, the officer conducted a strip search of Brown. During the strip search, the police "looked between [Brown's] cheeks" and saw "a clear plastic [b]aggie sticking out of [Brown's] anus." The officer, believing this baggie contained an undetermined amount of crack cocaine, decided that a body-cavity search was required and applied for a search warrant. The application "request[ed] a warrant to transport Brown to a medical facility and have the baggie removed" from Brown's rectum. A judge signed a warrant and authorized a search "ON THE PERSON OF BROWN."
The officer took Brown to North Memorial Hospital to remove the baggie. Brown was first given the option of removing the baggie himself. He refused. Officers then presented the warrant to Dr. Christopher Palmer, an emergency-room doctor. Dr. *287 Palmer, after consulting with a lawyer for North Memorial, did an external body search of Brown, including the anal area. Dr. Palmer did not see the baggie. Dr. Palmer offered Brown a laxative to remove the drugs. Brown refused.
The police then asked Dr. Palmer to force Brown to take the laxative. Dr. Palmer refused to do so. Dr. Palmer also refused to perform an anoscopy[1] as requested by the police or to call another doctor who might perform the anoscopy. Dr. Palmer refused any interventions beyond the external search because he did not feel that the warrant allowed the procedure. Dr. Palmer did tell the officers that he was "willing to comply with any Court order that specifically designated the appropriate interventions."
After Dr. Palmer refused to perform medical procedures based on the first warrant, the officer who requested the first warrant wrote a more specific warrant and decided to take Brown to a different hospital. The second warrant, signed by the same judge,[2] authorized a search of "THE DESCRIBED PERSON" and directed hospital staff to "use any medical/physical means necessary to have Brown vomit or deficate [sic] the contents of his stomach or physically by any means necessary remove the narcotics from the anal cavity so Officers can retrieve the narcotics." (Emphasis added.) The officer testified that he added this language because he is not a doctor and does not know any specific medical terms. He therefore used the phrase "any means necessary" so the doctor could decide how to remove the drugs safely. The police took Brown to Hennepin County Medical Center (HCMC), showed both warrants to Brown, and again requested that he remove the drugs himself. Brown refused.
The police then presented the warrant to Dr. Paul Nystrom, an emergency-medicine doctor at HCMC. Dr. Nystrom spoke with the on-call deputy county attorney from the civil division of the Hennepin County Attorney's Office who advised Dr. Nystrom that he could execute the warrant. Dr. Nystrom gave four options to Brown: (1) Brown could remove the baggie himself; (2) Dr. Nystrom could administer an enema, which would give Brown the urge to defecate; (3) Dr. Nystrom could perform an anoscopy with Brown under sedation; or (4) Dr. Nystrom could sedate Brown, place him on a ventilator, and intubate him with a nasogastric tube through which a laxative could be pumped into Brown's stomach to clear his bowels. Dr. Nystrom told Brown that the first two options were preferable, but required his cooperation. Brown did not reply.
After speaking with Brown a number of times and explaining the four options, Dr. Nystrom told Brown that he was going to leave the room and begin preparations for the sedation and anoscopy. When Brown further refused to speak, even after being given additional time to consider his options, Dr. Nystrom proceeded to perform the anoscopy. There is no dispute that Brown was of sound mind and could make *288 his own medical decisions and give his own consent to any procedure.
Dr. Nystrom had the hospital staff strap Brown down and place an I.V. to administer a sedative. While sedation was not necessary to perform the anoscopy, Dr. Nystrom felt it should be used "to make [the anoscopy ] less painful, less uncomfortable." There is no suggestion that the sedative was administered because Brown was uncooperative. After moving Brown to a procedure room, Dr. Nystrom placed a speculum into Brown's rectum and examined his anal cavity. The doctor described the speculum as "not comfortable." Two officers remained in the room and watched the intrusion into Brown's body cavity. Dr. Nystrom was able to locate the plastic baggie and remove it with a special type of forceps. The forceps is "like a pinchers of some sort that has ... a five- to six-inch arm on it that opens and closes." The doctor gave the baggie to the police, which law enforcement test results later showed held 2.9 grams of cocaine. Dr. Nystrom and the nursing staff did not observe any bleeding, tearing, or abrasions caused by the procedure.
Dr. Nystrom testified that he understood the language used in the search warrant-"any means necessary"-to mean "[a]nything reasonable, any reasonable means necessary." Importantly, Dr. Nystrom testified that "normal elimination" (waiting for the baggie to come out through natural processes) could be used and that no medical emergency existed when the procedure was performed.
Although he was originally arrested for selling drugs, the State ultimately charged Brown with one count of fifth-degree possession of a controlled substance, Minn. Stat. § 152.025, subd. 2(1) (2018). Brown moved to suppress the evidence of the drugs at an evidentiary hearing and raised a number of constitutional objections. Relevant to our review here, he argued that the search, even though conducted pursuant to a valid search warrant, was unreasonable. Brown relied on the balancing test announced by the Supreme Court of the United States in Winston v. Lee , 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985).
In its order, the district court noted that "there is a certain odiousness twisted up with the thought of police using the immense power of the government to literally invade a person's body," and such "unease is only aggravated when the judiciary paints its imprimatur on this kind of action by sanctioning it with ... a warrant." But, after analyzing the facts using the Winston framework, the district court concluded that despite "the extreme intrusiveness of the police action here ... on balance, the scales tip in favor of allowing the evidence." After a jury trial, Brown was convicted of fifth-degree drug possession under Minn. Stat. § 152.025, subd. 2(1).
Brown appealed his conviction. The court of appeals, after independently evaluating the Winston factors, agreed with the district court that the anoscopy was a reasonable search. State v. Brown , 915 N.W.2d 896, 903 (Minn. App. 2018). We granted Brown's petition for review.
ANALYSIS
The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV ; see also Minn. Const. art. I, § 10.[3] "[T]he ultimate *289 touchstone of the Fourth Amendment is reasonableness." Riley v. California , 573 U.S. 373, 381, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014) (citation omitted) (internal quotation marks omitted). Searches "which are not justified in the circumstances, or which are made in an improper manner," are not reasonable. Winston , 470 U.S. at 760, 105 S.Ct. 1611 (citation omitted) (internal quotation marks omitted).
If a search was unreasonable, the evidence obtained during the search is not admissible in court. State v. Rohde , 852 N.W.2d 260, 263 (Minn. 2014) ("Evidence obtained from an unreasonable search in violation of the Fourth Amendment is inadmissible." (citing Mapp v. Ohio , 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) )); see also State v. Mathison , 263 N.W.2d 61, 63 (Minn. 1978). When reviewing a pretrial order on a motion to suppress, we "review the district court's factual findings under [a] clearly erroneous standard ... [and] review the district court's legal determinations ... de novo." State v. Milton , 821 N.W.2d 789, 798 (Minn. 2012).
I.
We begin with a discussion of Winston because it is the case that sets the framework for the question presented. In Winston , the United States Supreme Court considered whether a state may compel a suspect in an attempted armed robbery to undergo surgery to obtain evidence of a crime contained within the suspect's body. 470 U.S. at 758, 105 S.Ct. 1611. The case arose from an attempted robbery. The alleged robber, Lee, was shot by his intended victim during the robbery and the bullet lodged underneath his skin beneath his left collarbone. Id. at 755-56, 105 S.Ct. 1611. The State sought to recover the bullet to demonstrate that the bullet had been fired from the gun used by Lee's intended victim. Id. at 765, 105 S.Ct. 1611. The State sought a court order to surgically remove the bullet as evidence of Lee's guilt. Id. at 756, 105 S.Ct. 1611.
The Court concluded that surgery to remove the bullet was an unreasonable search under the Fourth Amendment. Id. at 766, 105 S.Ct. 1611. The Court observed that intrusions into the body are different from other searches and implicate the "most personal and deep-rooted expectations of privacy." Id. at 760, 105 S.Ct. 1611. "A compelled surgical intrusion into an individual's body for evidence ... implicates expectations of privacy and security of such magnitude that the intrusion may be 'unreasonable' even if likely to produce evidence of a crime." Id. at 759, 105 S.Ct. 1611. Accordingly, the Court stated that "[t]he reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure." Id. at 760, 105 S.Ct. 1611. It set forth a three-factor balancing test calling for consideration of (1) "the extent to which the procedure may threaten the safety or health of the individual," (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity," and (3) "the community's interest in fairly and accurately determining guilt or innocence." Id. at 761-62, 105 S.Ct. 1611.[4] No one single factor is dispositive.
*290 Under the Fourth Amendment, the Winston balancing test is the appropriate framework for analyzing whether a search of a body cavity using an invasive medical procedure like an anoscopy is reasonable.[5] We turn to applying the Winston balancing test to the forced anoscopy of Brown.
II.
A.
The first Winston factor assesses the extent of the risk of the procedure to Brown's health and safety. Winston , 470 U.S. at 761, 105 S.Ct. 1611. The Supreme Court has said that "[n]otwithstanding the existence of probable cause, a search for evidence of a crime may be unjustifiable it if endangers the life or health of the suspect." Id. In Winston , the Court described a spectrum of harm ranging from the relatively limited risk of the blood draw in Schmerber v. California , 384 U.S. 757, 771-72, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (holding that taking the petitioner's blood did not violate petitioner's Fourth Amendment right to be free from unreasonable searches), to the indeterminate health and safety risk in Winston of an exploratory surgery to recover the bullet. Winston , 470 U.S. at 766, 105 S.Ct. 1611.
An anoscopy poses health and safety risks to the patient including potential bleeding, tearing, and bowel perforation, though the risks of a properly performed anoscopy are minimal. If the procedure had injured Brown, the injury would have been obvious to the doctor and could have been handled immediately. But because minor health and safety risks do exist, this factor tips slightly in Brown's favor.
We disagree with the dissent that a low-level health risk favors the State or a finding of reasonableness. Even a low-level risk is still a risk to the suspect. A lower risk to safety and health simply means the factor does not weigh heavily in favor of the suspect and offers only slight support to a conclusion that the search was unreasonable. Stated another way, our task is to weigh the protected interests of the suspect-avoiding *291 risks to health and safety and preserving fundamental individual dignity-against the need of the State to obtain evidence. The fact that a search method poses a low risk to health or safety does not weigh in favor of a conclusion that a search is reasonable; it weighs against such a conclusion.
The State argues that we should also consider the potential health and safety risks of the baggie breaking and causing an overdose. It asserts that those risks weigh in favor of conducting the anoscopy and a conclusion that the search was reasonable.
We disagree. The focus of the first Winston factor is on the risk the procedure poses to the suspect. The State erroneously confuses the risk of the baggie rupturing with the risk of the medical procedure. The decision to undergo an invasive procedure to avoid a medical risk rested solely with Brown who was alert and fully capable of consenting to the anoscopy.[6] Cf. Winston , 470 U.S. at 765, 105 S.Ct. 1611 ("When conducted with the consent of the patient, surgery ... is not necessarily demeaning or intrusive [because] ... the surgeon is carrying out the patient's own will ....").
Further, the doctors who attended to Brown believed that a baggie rupture was not imminent. Brown did not show any signs of overdose. The doctors did not consider the presence of the baggie in Brown's rectum to be a medical emergency at the time of the procedure. In short, the State's argument that an invasive body search for evidence of a crime was justified under the Fourth Amendment because the State was altruistically acting to save Brown does not hold up. See George v. Edholm , 752 F.3d 1206, 1219 (9th Cir. 2014) (rejecting the claim that an anoscopy and involuntary ingestion of a laxative to retrieve drugs were necessary to save the plaintiff's life, concluding "[t]hat sort of speculative, generalized risk cannot on its own justify [invasive] nonconsensual procedures"); United States v. Cameron , 538 F.2d 254, 258-59 & n.8 (9th Cir. 1976) (holding that a search of an individual's anal cavity using forced digital probes, enemas, and involuntary ingestion of a laxative was unconstitutional because no medical emergency required the instant seizure of the evidence).
B.
The second factor-"the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity," Winston , 470 U.S. at 761, 105 S.Ct. 1611 -strongly supports the conclusion that the forced anoscopy under sedation *292 was unreasonable and violated the Fourth Amendment. The State concedes that this factor favors a conclusion that an anoscopy was an unreasonable search under the Fourth Amendment.
"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." Schmerber , 384 U.S. at 767, 86 S.Ct. 1826. Searches that invade the body are generally "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive," and signify "degradation and submission." Blackburn v. Snow , 771 F.2d 556, 564 (1st Cir. 1985) (citation omitted) (internal quotation marks omitted); see Winston , 470 U.S. at 760, 105 S.Ct. 1611 (noting that intrusions into the body are different from other searches and implicate the "most personal and deep-rooted expectations of privacy"). These concerns are heightened here. The State compelled a search of Brown's anal cavity, a part of the body that is recognized by society as undoubtedly private.
In addition, the anal search involved an intrusive and forced medical procedure. The medical professionals strapped Brown down to the procedure table, inserted an I.V., and sedated him.[7] After administering the sedative, Dr. Nystrom inserted a speculum into Brown's rectum-a procedure Dr. Nystrom acknowledged was uncomfortable-and examined his anal cavity. Dr. Nystrom then inserted forceps into Brown's rectum to retrieve the baggie. All this poking and prodding of Brown's rectum occurred while two police officers remained and watched. Brown did not consent to any of this.
Our conclusion that the forced anoscopy is a serious invasion of Brown's individual dignitary interests is supported by the Supreme Court's decision in Rochin v. California , 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). In that case, the defendant's stomach was pumped for retrieval of potential drugs after police observed him consuming two white pills during a search of his home. Id. at 166, 72 S.Ct. 205. The Supreme Court said the use of the medical procedure "shocks the conscience" and compared it to a confession obtained by coercion. Id. at 172, 72 S.Ct. 205. The Court held that "the forcible extraction of [defendant's] stomach[ ] contents ... to obtain evidence is bound to offend even hardened sensibilities." Id.[8]
*293 If a coerced invasion of one's anal cavity-an area inherently personal and private-while sedated and in front of strangers is not a serious and substantial intrusion of an individual's dignitary interest in personal privacy and bodily integrity, we cannot fathom what is. We conclude that the second Winston factor strongly favors finding the anoscopy to be an unreasonable search under the Fourth Amendment.[9]
C.
The third Winston factor considers the "community's interest in fairly and accurately determining [Brown's] guilt or innocence." Winston , 470 U.S. at 762, 105 S.Ct. 1611. This interest is of "great importance." Id. The Supreme Court has instructed that the police may not conduct a search involving an intrusion of a person's body without a "clear indication" that evidence will be obtained:
The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.
Schmerber , 384 U.S. at 769-70, 86 S.Ct. 1826.
Further, even if a search is "likely to produce evidence of a crime," a forced intrusion into a person's body may be unreasonable. Winston , 470 U.S. at 759, 105 S.Ct. 1611. It is not enough that the evidence "may turn out to be useful." Id. at 766, 105 S.Ct. 1611. The State must show a "compelling need" for the evidence. Id. The State could show a compelling need by demonstrating that no evidence other than the fruits of the invasive body search proves that the defendant committed the crime.
Although the suspicion that the baggie in Brown's rectum contained evidence of a crime is somewhat more speculative here than the certainty in Winston that a bullet was lodged in the muscle below Lee's collarbone, we conclude that the police officers had a clear indication that Brown had a baggie in his rectum that possibly contained a controlled substance. The confidential informant told the officers that Brown kept the drugs that he intended to sell in his pants. The officers observed *294 Brown grinding his buttocks against a chair and using his hands to shove something upwards between his legs. During a subsequent strip search, the police observed a clear plastic baggie sticking out of Brown's anus. In addition, obtaining the drugs from the baggie was necessary to prove the ultimate charge of fifth-degree drug possession. See Minn. Stat. § 152.025, subd. 2(1).[10] This factor favors a conclusion that the anoscopy was a reasonable search under the Fourth Amendment.
D.
We now turn to balancing the three Winston factors.
The anoscopy posed health and safety risks to Brown, though minimal. The first Winston factor therefore slightly favors a conclusion that the anoscopy was unreasonable. But when we balance the second Winston factor-the significant and serious invasion of Brown's individual dignitary interests in personal privacy and bodily integrity-against the third-the State's need to retrieve evidence to support a fifth degree drug possession conviction-we conclude that forcing Brown to undergo the anoscopy was not reasonably justified by the State's need to retrieve the baggie that likely contained a controlled substance.
Two considerations lead us to that conclusion. First, several particulars of the bodily intrusion make the coerced anoscopy odious and extremely intrusive as the district court aptly described it. Brown was alert and capable of consent. He was strapped down to a hospital table. He was sedated without his consent. The doctor used medical instruments that are uncomfortable and inserted the instruments into Brown's rectum. The particular procedure in this case exposed and invaded a part of the body that our society considers especially private. And nonmedical personnel remained in the room and observed the procedure. It is an extremely serious invasion of a person's dignity and privacy for the State to force a person to undergo an anoscopy. We conclude that the invasion of Brown's dignitary interests in privacy and bodily integrity under these circumstances outweighs the State's interest in retrieving the evidence.
Second and significantly, the police had available a far less intrusive option to recover the baggie. The medical professionals acknowledged, and the State concedes, that the police could have waited for the baggie and its contents to work themselves out of Brown's body naturally. The State did not argue that the anoscopy was urgent because the police were nearing the maximum time they could hold Brown before charging him. The record shows that the anoscopy occurred within hours of Brown's arrest. The record does not show a risk that the evidence would dissipate if the police waited for Brown to pass the baggie naturally and the State does not claim that exigent circumstances existed. And while the dissent raises dignitary concerns with the natural-elimination method of retrieving the baggie, it properly does not go so far as to suggest that natural elimination is more invasive than the coerced anoscopy that the State actually used. The existence of a practical option to retrieve the baggie through natural elimination diminishes the State's interest in demanding that Brown undergo a forced anoscopy.
The State and the dissent argue that we are not permitted to consider less intrusive *295 options than a surgical invasion of a body cavity for retrieving evidence when assessing the Fourth Amendment reasonableness of such an invasive search. We disagree. Neither the Supreme Court nor our court has ever prohibited consideration of less-intrusive means of discovering evidence when assessing the reasonableness of a warranted search. To the contrary, the Court has merely held that "[t]he reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means." Illinois v. Lafayette , 462 U.S. 640, 647, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) (emphasis added); see Cady v. Dombrowski , 413 U.S. 433, 447, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) ("The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself , render the search unreasonable." (emphasis added)).[11] Indeed, in the case upon which the State relies, Vernonia School District 47J v. Acton , 515 U.S. 646, 663, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), the Court in fact considered a purportedly "less intrusive" alternative method of testing athletes for drug use while balancing Fourth Amendment individual privacy interests and governmental interests. The Court simply concluded that the alternative method was impractical and not less intrusive. Id. at 663-64, 115 S.Ct. 2386.
Our task is to balance two important competing interests that point toward different conclusions regarding the reasonableness of the State's search of Brown. On the one hand, the coerced anoscopy is a serious invasion of Brown's constitutionally protected interest in personal dignity and bodily integrity. On the other hand, the State has a compelling need to obtain the baggie as evidence of criminal activity. In balancing those competing interests, the existence of a practical but significantly less invasive form of search (natural elimination) tips the balance toward a conclusion that the coerced anoscopy was an unreasonable and unconstitutional search. See United States v. Booker , 728 F.3d 535, 547 (6th Cir. 2013) ("When less intrusive means to investigate were available but not used and when the prosecution has other ways to establish guilt, this diminishes the weight that should be given to using an involuntary and invasive medical procedure to further society's interest in fairly and accurately determining guilt or innocence.").
The dissent makes much of the fact that Brown refused to agree to search options that were less invasive than an anoscopy for removing the baggie. But the fact that a person does not cooperate with the police-even in response to a warrant-does not mean that the State has a right to conduct a search in an unreasonable manner.[12] See *296 Minn. Stat. § 609.06, subd. 1 (2018) (stating that a public officer may use only "reasonable force" upon a person when executing a warrant).
Considering all of these factors, we conclude that forcing Brown to undergo an anoscopy while involuntarily sedated and without his consent in the presence of nonmedical personnel was an unreasonable search under the Fourth Amendment. Accordingly, evidence from the search must be suppressed.[13] And because there is a reasonable possibility that Brown would not have been convicted had evidence of the drugs obtained by means of the coerced anoscopy been excluded, the failure to suppress is not harmless beyond a reasonable doubt. State v. Juarez , 572 N.W.2d 286, 291 (Minn. 1997).[14]
CONCLUSION
For the foregoing reasons, we reverse and remand to the district court to vacate the judgment of conviction and for a new trial.
Reversed and remanded.
Dissenting, McKeig, J.
HUDSON, J., took no part in the consideration or decision of this case.
DISSENT

An anoscopy is a medical procedure where a tool is used to look inside a person's rectum. Risks associated with an anoscopy include bleeding, tearing, and abrasions. Dr. Paul Nystrom, the Hennepin County Medical Center doctor who ultimately performed an anoscopy on Brown, testified that "[i]f you're really aggressive and not careful, you could perforate the bowel. It would be a very rare case, a very blunt sort of instrument ...."

The police officer who prepared the warrant testified that he told the judge that Dr. Palmer had refused to execute the first warrant and that was why he was coming back for a second warrant. This discussion is not reflected, however, in any police reports.

Brown contends that the Minnesota Constitution provides heightened protections for citizens against unreasonable searches. Because we hold that the search was unreasonable under the United States Constitution, we need not decide whether the Minnesota Constitution provides more protection.

The State argues that "whether a search warrant was issued" is a separate Winston factor that should be weighed in the balancing in favor of a conclusion that the forced anoscopy was reasonable. We disagree. While the police officers rightly sought a warrant for the body cavity search of Brown, the search warrant-itself based on probable cause-is merely a threshold requirement before the police can force a person to undergo an intrusion into the human body. Winston , 470 U.S. at 760-61, 105 S.Ct. 1611 (citing Schmerber v. California , 384 U.S. 757, 770, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) ). This conclusion is particularly compelling in this case when the judge issuing the warrant did not assess, and placed no meaningful limits on, the scope or methodology of the search. The judge was provided with no information about what the possible options for removing the baggie might be. The judge simply signed a warrant drafted by a police officer (who admitted that he also had no information about the possible options for removing the baggie), authorizing the police to use "any medical/physical means necessary" to extract the baggie. In short, the district court made no assessment whatsoever of the reasonableness of an anoscopy when it issued the warrant. Notably, in Winston , the Supreme Court found the search unreasonable despite a district court order that the search was reasonable issued after an adversarial hearing -a much more searching inquiry than simply signing a warrant at an officer's request.

Several courts have applied Winston to nonsurgical body cavity searches. See, e.g. , United States v. Fowlkes , 804 F.3d 954, 959-60, 962 (9th Cir. 2015) (finding that the forced removal of a plastic baggie from the defendant's rectum by police officers was unreasonable); United States v. Booker , 728 F.3d 535, 545-47 (6th Cir. 2013) (holding that a series of medical procedures including administering paralytic and sedative drugs and inserting a breathing tube to search the defendant's rectum for cocaine was unreasonable); United States v. Gray , 669 F.3d 556, 564-65 (5th Cir. 2012) (holding under the Winston factors that a search involving involuntary sedation and an anal probe was unreasonable, but affirming the admission of evidence obtained from the search under the good-faith exception), vacated on other grounds , 568 U.S. 802, 133 S.Ct. 151, 184 L.Ed.2d 2 (2012).

In the Minnesota Health Care Bill of Rights, the Legislature provided that "[c]ompetent patients ... shall have the right to refuse treatment." Minn. Stat. § 144.651, subd. 12 (2018). We have recognized that the right to refuse medical treatment is "based upon a constitutional right of privacy and/or the common law right to be free from invasions of one's bodily integrity"-the very same constitutional right at issue in this case. In re Conservatorship of Torres , 357 N.W.2d 332, 339 (Minn. 1984). Indeed, we have long held that medical professionals generally do not have authority to perform medical procedures without a patient's consent. See Mohr v. Williams , 95 Minn. 261, 104 N.W. 12, 15 (1905) ("Consent ... must be either expressly or impliedly given before a surgeon may have the right to operate." (citation omitted) (internal quotation marks omitted)), overruled in part on other grounds by Genzel v. Halvorson , 248 Minn. 527, 80 N.W.2d 854, 858-59 (1957). But the medical professional may do so when faced with a medical emergency and the patient is incapable of providing consent. See Bang v. Charles T. Miller Hosp. , 251 Minn. 427, 88 N.W.2d 186, 190 (1958) (noting that "reasonable latitude must be allowed a physician so as to not ... prohibit him from taking such measures ... for the welfare of the patient in a case of emergency"); see also Mohr, 104 N.W.at 15. This is not such a case.

The use of a sedative without consent adds to our concerns about the invasion of individual dignity interests. See Winston , 470 U.S. at 765, 105 S.Ct. 1611 (noting that use of anesthesia is an extensive intrusion on an individual's personal privacy and bodily integrity because it allows the State "to take control of [an individual's] body, to drug [the] citizen-not yet convicted of a criminal offense-with narcotics and barbiturates into a state of unconsciousness ... to search beneath his skin for evidence of a crime" (citation omitted) (internal quotation marks omitted)); see also Booker , 728 F.3d at 547 (expressing concern over the reasonableness of a search where the defendant was "paralyzed, intubated, and anally probed without his consent"); Gray , 669 F.3d at 561, 564 (noting that the suspect was sedated but remained conscious during a proctoscopy ); Sanchez v. Pereira-Castillo , 590 F.3d 31, 45 (1st Cir. 2009) (describing the use of exploratory surgery in the plaintiff's abdominal cavity under "total anesthesia" as "egregious"). Nothing in the record supports the notion that Brown was forcibly drugged because he was uncooperative. Dr. Nystrom testified that drugs were administered to make the procedure more comfortable. In any event, the use of a sedative is just one fact that makes the coerced search a significant intrusion into Brown's dignitary interests.

"Though Rochin was decided under the Due Process Clause of the Fourteenth Amendment, the Court has made clear it would now 'be treated under the Fourth Amendment, albeit with the same result.' " George , 752 F.3d at 1217 (quoting County of Sacramento v. Lewis , 523 U.S. 833, 849 n.9, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ). The dissent attempts to distinguish Rochin because there the police did not have a warrant before directing a doctor to pump the suspect's stomach. As discussed in footnote 4, the police acted properly in obtaining a warrant, but the warrant's existence here does not change the fact that the Supreme Court found the coercive stomach pumping in Rochin to be a serious and constitutionally impermissible invasion of individual dignitary interests in the integrity and privacy of the body. The Fourth Amendment protects "the right of the people to be secure in their persons" and separately requires that "no Warrant shall issue, but upon probable cause, supported by Oath or affirmation ...." U.S. Const. amend. IV. The existence of probable cause and the reasonableness of a search are separate inquiries.

The State contends that Brown's dignitary interest in personal privacy and bodily integrity is less compelling, and thus the invasion is justified, because he created the need for the forced removal of the baggie from his rectum by actively inserting the baggie there himself. However, a suspect's role in creating the need for a search does not mean the State can use unreasonable methods to conduct the search. The police observation that Brown inserted a baggie into his rectum is relevant and properly considered when assessing the third Winston factor, which requires that the State establish that a clear indication exists that evidence of a crime will be recovered as a result of the search.

It is unclear from the record why the State decided to shift prosecution from the offense of arrest-selling drugs, for which other evidence of guilt existed-to the offense of drug possession.

Lafayette involved a jailhouse administrative inventory search. 462 U.S. at 641-42, 103 S.Ct. 2605. The Court concluded that administrative inventory searches are justified by several government interests, including avoiding false claims for misplaced or stolen property and jailhouse security. Id. at 646, 103 S.Ct. 2605. The Court emphasized that it would not second-guess police procedures in that context, especially if there is proof the police were simply following uniform inventory procedures set in advance that apply to all persons in custody. Id. at 646-48, 103 S.Ct. 2605 ; see Colorado v. Bertine , 479 U.S. 367, 368-69, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (upholding admission of evidence obtained from a warrantless inventory search). This is a much different case. The search here was not an administrative evidence search conducted according to preestablished police procedures but rather a search under a poorly defined, largely unlimited warrant plainly aimed at discovering evidence of a crime.

The Court in Winston set aside without deciding the issue of whether, when conducting an otherwise reasonable search, use of general anesthesia is reasonable to sedate a suspect who is uncooperative. Winston , 470 U.S. at 764 n.9, 105 S.Ct. 1611 (citing State v. Lawson , 187 N.J.Super. 25, 453 A.2d 556, 557-58 (1982) (discussing the need to use general anesthesia rather than local anesthesia where a defendant is uncooperative)).

Because we conclude that Brown's forced anoscopy was an unreasonable search under the Fourth Amendment, we do not reach Brown's argument that the court must conduct an adversarial hearing, similar to the one provided in Winston , before issuing a warrant authorizing an invasive medical procedure.

The State advocates for the adoption and application of the good-faith exception to the warrant. "Appellate review of an issue can be forfeited when a party fails to raise the issue in the district court." Ries v. State , 920 N.W.2d 620, 639 (Minn. 2018). Because the State failed to argue for the application of a good-faith exception before the district court, that issue is forfeited.